T.C. Memo. 2003-96


UNITED STATES TAX COURT


NANCY B. DOYLE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9137-01L.            Filed April 3, 2003.


<u>Steven L. Sablowsky</u>, for petitioner.

<u>Julia L. Wahl</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  The petition in this case was filed in response to a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330.  The sole issue for decision is whether respondent erroneously denied petitioner's

request for relief from joint tax liability pursuant to section 6015(b) or (f).[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

At the time the petition was filed, petitioner resided in Pittsburgh, Pennsylvania.

The Deficiencies and Tax Court Cases

For the years 1980 through 1983, petitioner and her husband, Richard E. Doyle (the Doyles), timely filed joint Federal income tax returns on which they deducted expenses associated with various tax shelters, including horse breeding and racing tax shelters.[2] Respondent audited the Doyles' 1980 through 1983 tax returns and disallowed the claimed tax shelter deductions. Respondent issued notices of deficiency to the Doyles determining tax deficiencies and penalties in excess of $100,000.

The Doyles timely filed petitions with this Court seeking redetermination of deficiencies for the tax years 1980 through 1983. The cases, docket Nos. 6518-87 and 9855-88, were tried in

---

[1]Except as indicated to the contrary, all section references are to the Internal Revenue Code as amended.

[2]For example, on their 1980 return, the Doyles claimed tax shelter deductions of $69,721 on gross income of $101,053.

March 1989, and the Court issued its opinion on July 7, 1992.[3] Most of the issues in the cases were resolved adversely to the Doyles. The deficiencies ultimately determined and assessed were as follows:

| Year | Deficiency |
|------|-----------|
| 1980 | $31,854.92 |
| 1981 | 35,007.80 |
| 1982 | 25,209.22 |
| 1983 | 4,600.80 |

Additionally, respondent assessed more than $294,000 of interest on the deficiencies.

In 1996, the Doyles filed another petition with this Court, docket No. 17325-96, seeking redetermination of an additional deficiency asserted by respondent on their 1983 return. The sole issue in that case was whether the statute of limitations barred the additional assessment. The parties stipulated to be bound by the result in a related case, docket No. 8309-96, in which the Court held that the period of limitations was still open. See Doyle v. Commissioner, T.C. Memo. 1997-396, affd. without published opinion 202 F.3d 253 (3d Cir. 1999). Accordingly, on January 28, 1998, the Court entered a stipulated decision.[4] On

---

[3]See Brown v. Commissioner, T.C. Memo. 1992-379, affd. without published opinion sub nom. Konenkamp v. Commissioner, 14 F.3d 47 (3d Cir. 1993).

[4]This decision was subsequently affirmed. See Doyle v. Commissioner, T.C. Memo. 1997-396, affd. without published opinion 202 F.3d 253 (3d Cir. 1999).

March 27, 1998, respondent assessed $13,750 in additional tax, penalties, and interest against the Doyles.

Post-Tax-Court-Opinion Financial Transactions

On September 14, 1992, a deed was recorded transferring real property owned by the Doyles to their son and his wife for $1. On September 21, 1992, two checks drawn on the bank account of "Lavina Maudice or Nancy B. Doyle,"[5] PNB account No. 04130419 (the Lavina/petitioner bank account), in the amount of $5,000 were made payable to Bridget Fink and Andrew Fink, petitioner's daughter and son-in-law, respectively. On September 24, 1992, a check drawn on a Parkvale Savings Bank account, No. 022061410, held in the names of "Bridget or Andrew Fink", was made payable to the Dreyfus Family of Funds in the amount of $10,000.

On October 30, 1992, a Parkvale Savings Bank account No. 000033816 was opened in the names of "Michele or Denise Doyle" (Michele/Denise Doyle bank account No. 1).[6] The initial deposit to the account was $2,450 in cash and a $500 check from the Lavina/petitioner bank account.

On November 5, 1992, an account at PNC Savings Bank, account No. 10749779, was opened in the names of "Denise Doyle or Michele Doyle" (Michele/Denise Doyle bank account No. 2). The initial

---

[5]Lavina Maudice, now deceased, was petitioner's aunt.

[6]Michele and Denise Doyle are petitioner's daughters.

deposit was $26,000, $7,000 of which came from a check signed by petitioner and drawn on the Lavina/petitioner bank account.

On November 25, 1992, Residential Advisor's, Inc. check No. 185, made payable to petitioner and her husband in the amount of $2,966.40, was deposited into the Michele/Denise Doyle bank account No. 1.

On February 23, 1993, petitioner and her husband encumbered their previously lien-free residence with a mortgage. On March 1, 1993, petitioner and her husband received the mortgage proceeds in the form of a check for $93,424.03. On March 3, 1993, petitioner and her husband used the mortgage proceeds to obtain $10,000 in cash and the following cashier's checks:[7]

| Check No. | Amount | Payee |
|-----------|--------|-------|
| 59205410 | $8,180.45 | Nancy Doyle |
| 59205421 | 8,180.45 | Nancy Doyle |
| 49205355 | 8,180.45 | Richard Doyle |
| 59205366 | 8,180.45 | Richard Doyle |
| 59205400 | 8,180.45 | Richard Doyle |
| 59205388 | 8,180.45 | Richard Doyle |
| 59205443 | 8,180.45 | Richard Doyle |
| 59205454 | 8,180.44 | Nancy Doyle |
| 59205465 | 8,180.44 | Nancy Doyle |
| 59205476 | 9,700.00 | Nancy Doyle |

The above-listed checks were disposed of as follows:

(i) Check No. 59205410 was endorsed by petitioner and deposited on March 29, 1993, into the Michele/Denise Doyle bank account No. 1;

---

[7]The Doyles were charged a $10 transaction fee for each cashier's check.

(ii) check No. 59205421 was endorsed by petitioner and her daughter Bridget Fink, and on March 4, 1993, it was deposited into Parkvale Savings bank account No. 01-0020114, held in the name of her daughter Bridget (Doyle) Fink;

(iii) on March 4, 1993, check Nos. 49205355, 59205366, 59205400, 59205388, 59205443, and 59205454 were deposited into the Doyles' joint checking account at Great American Federal, account No. 20355384. Within 2 weeks of the deposit, $39,598.50 from this account was transferred to the Doyles' children and $12,598.50 was withdrawn in cash. Of the $39,598.50, $27,000 was transferred to the Doyles' children on the day of deposit and consisted of three checks for $9,000 each made payable to each of the following: Denise, Michele, and Meghan Doyle. Petitioner signed all three checks;

(iv) check No. 59205465 was deposited into the Lavina/petitioner bank account. Petitioner then issued check No. 1707 for $8,100 from the Lavina/petitioner bank account to her daughter-in-law Jill Doyle. On March 6, 1993, that check was deposited into Parkvale Savings Bank account No. 02-2183135 held in the names of "Richard P. Doyle or Jill A. Doyle."; and

(v) on March 4, 1993, check No. 59205476 was endorsed by petitioner and cashed at Great American Federal.

From May 28 to June 7, 1993, petitioner and her husband took a vacation to England and Italy which cost approximately $9,000.

On July 28, 1993, Great American Federal checking bank account No. 20374823 (the Great American Federal checking account) was opened in the names of petitioner's daughters, "Bridget or Meghan Doyle". Checks were drawn on this account from time to time to pay petitioner and her husband's expenses.[8] The bank statements and canceled checks for this account were mailed to petitioner's address, where her daughter Meghan Doyle resided. Additionally, checks made payable to the Doyles were deposited into the Great American Federal checking account.[9]

On July 30, 1993, the Internal Revenue Service filed notices of Federal tax liens against the Doyles for the tax liabilities redetermined by this Court. Between September 18 and September 25, 1993, petitioner and her husband took a vacation to Italy at a cost of approximately $11,000.

On September 23, 1993, petitioner's husband liquidated an investment interest in Colonial Properties, Inc. The proceeds of the liquidation were received in the form of a check in the amount of $20,900 dated September 23, 1993, and made payable to

---

[8]Petitioner's husband explained their use of the daughters' bank accounts at a bankruptcy creditor's meeting: "We had our daughter Bridget or Meghan write checks for our living expenses * * *. Quite honestly the reason for this was because we were worried about putting money into our account * * * and take the chance and jeopardizing the IRS attaching that money."

[9]On June 10, 1994, petitioner and her husband gave respondent a collection statement which failed to disclose the Great American Federal checking account.

petitioner's husband. On October 7, 1993, this check was endorsed and deposited into the Michele/Denise Doyle bank account No. 2.

On December 23, 1993, petitioner's husband liquidated an investment interest in Colonial Properties Services, Inc. The liquidation proceeds were received in the form of a check in the amount of $5,543.88. On December 30, 1993, this check was endorsed and deposited into the Michele/Denise Doyle bank account No. 2.

On June 10, 1994, petitioner and her husband completed and signed Form 433-A, Collection Statement for Individuals. On this form, the Doyles understated the value of their home; they listed its value as $90,000 even though in February 1993, they had obtained a $97,500 mortgage on the property.

On December 24, 1994, $8,845.73 was deposited into the Michele/Denise Doyle bank account No. 1, $8,000 of which was cash and the balance of which consisted of three checks from Wellington Power Corp., made payable to petitioner, and one check from Parker & Parsley Partnership Distribution Account, made payable to petitioner and her husband. On December 27, 1994, $8,900 of funds belonging to petitioner and her husband was deposited into the Michele/Denise Doyle bank account No. 2.

The Bankruptcy Case

On May 5, 1995, petitioner and her husband filed a voluntary petition for liquidation under chapter 7 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Western District of Pennsylvania (the bankruptcy case). In the bankruptcy case, respondent filed a $379,025.90 proof of claim. On June 17, 1996, the bankruptcy court granted the Doyles a discharge pursuant to 11 U.S.C. sec. 727.

In this case, petitioner initially contended that the income taxes at issue were discharged in the bankruptcy case. Petitioner conceded before trial that her joint and several income tax liabilities for the years 1980 through 1983 were excepted from bankruptcy discharge pursuant to 11 U.S.C. sec. 523(a)(1)(C).

Payment of Tax Deficiencies

The Doyles have not made any voluntary payments on their assessed tax liabilities. During 1994 and 1995, respondent placed a continuing levy on the wages of petitioner's husband which resulted in the receipt of $34,672.71 and $14,132.45, respectively. On June 5, 1995, respondent applied a $6,345 overpayment due the Doyles to their 1980 tax liability. In addition, respondent retained the following refunds due the Doyles to offset their assessed tax liabilities:

| Year | Refund Claimed and Due |
|------|------------------------|
| 1995 | $6,044 |
| 1996 | 839 |
| 1997 | 384 |
| 1998 | 924 |
| 1999 | 637 |

On October 31, 1994, the Doyles submitted an offer in compromise of their outstanding tax liabilities. Respondent did not accept the offer in compromise.

On September 5, 2000, respondent issued to petitioner his final Notice of Intent To Levy and Notice of Your Right To a Hearing. On October 2, 2000, petitioner sent to respondent Form 8857, Request for Innocent Spouse Relief, and Form 12153, Request for Collection Due Process Hearing, with respect to the aforementioned tax liabilities. On January 23, February 20, and May 8, 2001, hearings were held with the IRS Appeals Office to determine the appropriateness of the proposed levy action. On June 22, 2001, respondent issued a notice of determination sustaining the proposed levy action. Respondent determined that the tax liabilities were not discharged in the bankruptcy case, and that petitioner did not qualify for relief from joint and several liability under section 6015.

Petitioner's Background Information

Petitioner has a high school education. From 1962 until 1983, petitioner was a homemaker and stay-at-home mother. During the years at issue, petitioner had no business experience and no

earnings.  Petitioner never reviewed the returns at issue before signing them.  The returns were prepared by the promoter of the tax shelters.  Petitioner was responsible for paying the family's expenses; she wrote the checks for all expenses.  At her husband's direction, petitioner wrote the checks for the tax shelter investments.  Petitioner and her husband are still married.

## OPINION

Pursuant to section 6330, petitioner sought relief from respondent's proposed collection action.  Section 6330 allows a taxpayer to raise appropriate spousal defenses.  Petitioner contends that respondent improperly denied her relief from joint and several income tax liability under section 6015(b) or (f).  For the reasons stated <u>infra</u>, we sustain respondent's determination.  Our jurisdiction is predicated upon section 6330(d)(1)(A).  See <u>Davis v. Commissioner</u>, 115 T.C. 35, 37 (2000); <u>Sego v. Commissioner</u>, 114 T.C. 604, 610 (2000); <u>Goza v. Commissioner</u>, 114 T.C. 176, 179 (2000).

## Section 6015(b)(1)

Section 6015(b)(1) states five conjunctive requirements that a taxpayer must meet to qualify thereunder for relief from joint tax liability.  Section 6015(b)(1)(C) requires the spouse seeking relief to show that in signing the return she did not know, and had no reason to know, that there was an understatement.

Petitioner has failed to satisfy this requirement.  Petitioner was aware of the existence of the tax shelter investments; she wrote the checks.  See Alt v. Commissioner, 119 T.C. 306 (2002); Jonson v. Commissioner, 118 T.C. 106 (2002) (no evidence was presented that husband concealed or attempted to deceive electing wife concerning couple's financial affairs).  There is no evidence that petitioner was denied access to the documents concerning the tax shelters.  See Jonson v. Commissioner, supra at 119 (spouse had access to financial files).  Petitioner has not alleged that she was misled but only that she relied on her husband to take care of the returns.  See Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993) ("Although * * * [the taxpayer] claims to have signed the returns without reading them, she nevertheless is charged with constructive knowledge of their contents."), affg. T.C. Memo. 1992-228; Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989) (spouse cannot obtain benefits by simply turning a blind eye to facts fully disclosed on return); Levin v. Commissioner, T.C. Memo. 1987-67 (spouse cannot obtain benefits of innocent spouse protection in deduction case "by simply turning a blind eye to--by preferring not to know of--facts fully disclosed on a return, of such a large nature as would reasonably put such spouse on notice that further inquiry would need to be made").

Relief-seeking taxpayers must also establish, inter alia, that "taking into account <u>all the facts and circumstances</u>, it is inequitable to hold the * * * [electing taxpayer] liable for the deficiency in tax for such taxable year attributable to such understatement".  Sec. 6015(b)(1)(D) (emphasis added).  In determining the equities, the "Relevant factors include [but are not limited to] significant benefits received as a result of the understatements by the spouse claiming relief, [and] any participation in wrongdoing on the part of the 'innocent' spouse".[10]  <u>Friedman v. Commissioner</u>, 53 F.3d 523, 532 (2d Cir. 1995), affg. in part and revg. in part on another ground T.C. Memo. 1993-549; see S. Rept. 91-1537, at 3-4 (1970), 1971-1 C.B. 606, 607-608.[11]  "Whether the failure to report correctly tax liability results from 'concealment, overreaching, or any other wrongdoing' on the part of the 'guilty' spouse is also relevant." <u>Hayman v. Commissioner</u>, <u>supra</u> at 1262; see <u>Jonson v. Commissioner</u>, <u>supra</u>.

---

[10]Guidance in determining "whether it would be inequitable to hold a requesting spouse" liable can also be found in Rev. Proc. 2000-15, 2000-1 C.B. 447.  See sec. 1.6015-2(d), Income Tax Regs.

[11]Since sec. 6015(b)(1) is similar to former sec. 6013(e)(1), we may look to cases interpreting former sec. 6013(e)(1) for guidance when analyzing sec. 6015(b)(1).  <u>Butler v. Commissioner</u>, 114 T.C. 276, 283 (2000); <u>Rowe v. Commissioner</u>, T.C. Memo. 2001-325.

One particularly relevant factor "is whether the requesting spouse significantly benefited, directly or indirectly, from the understatement."[12]  Sec. 1.6015-2(d), Income Tax Regs.  "Normal support", however, is not considered a significant benefit.  See Friedman v. Commissioner, supra at 532; Hayman v. Commissioner, supra at 1262; Flynn v. Commissioner, 93 T.C. 355, 367 (1989).  "'Unusual support or transfers of property to the spouse would, however, constitute "benefit" and should be taken into consideration * * *' even when the benefit was received 'several years after the year in which the omitted item should have been included in gross income'".  Estate of Krock v. Commissioner, 93 T.C. 672, 679 (1989) (quoting S. Rept. 91-1537, supra at 3, 1971-1 C.B. at 607-608); see Hayman v. Commissioner, supra at 1262.

We find that petitioner significantly benefited from the unpaid liability or items giving rise to the deficiency.  See Rev. Proc. 2000-15, sec. 4.03(2)(c), 2000-1 C.B. 447, 449.  The Doyles received significant tax refunds as a result of the tax

---

[12]The original predecessor of sec. 6015 explicitly required the consideration of "whether or not the other spouse significantly benefitted directly or indirectly from the items omitted from gross income."  See Act of Jan. 12, 1971, Pub. L. 91-679, sec. 1, 84 Stat. 2063.  Although such consideration is no longer an explicit requirement of the statute, nonetheless, it is still a factor of significance.  See Estate of Krock v. Commissioner, 93 T.C. 672, 679 (1989); Purcell v. Commissioner, 86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987); H. Rept. 98-432 (Part 2), at 1501, 1502 (1984).

shelter deductions.[13]  Petitioner testified that the refund checks were deposited into the family checking account to "Do the household things we wanted to do."  Additionally, the parties' stipulation that petitioner and her husband enjoyed two vacation trips to Europe immediately after this Court's decision that the couple owed significant amounts of Federal income tax weighs heavily against her.

In determining the equity of the sought-after relief, we also find it significant that petitioner and her husband tried to thwart respondent's collection activities.  The record demonstrates that after this Court sustained respondent's deficiency determinations, petitioner and her family engaged in a systematic plan to put their assets beyond the reach of respondent's legitimate collection activities.  Petitioner and her husband encumbered their personal residence, which they had previously owned lien free.  The proceeds of the mortgage were immediately converted into cash and cash equivalents and spread among petitioner's children by deposit into freshly opened bank accounts in the children's names.  Petitioner and her husband liquidated investments and transferred the funds to their children.  The children used transferred funds to pay their

_____

[13]By their very nature, the erroneous deductions provided the Doyles with more disposable income than they otherwise would have had.  For example, the Doyles "sheltered" approximately 69 percent of their 1980 income.

parents' expenses. Petitioner and her husband took two trips to Europe at a cost of approximately $20,000. Petitioner and her husband transferred real property to their son for $1. Considering the above, there can be no question that petitioner materially participated in this plan to make herself and her husband "collection proof". It is elementary, of course, that one seeking equity must do equity. Given the facts of this case, it is not inequitable to deny petitioner relief from joint income tax liability.

Equitable Relief--Section 6015(f)

Alternatively, petitioner asks us to hold that respondent abused his discretion in denying her equitable relief pursuant to section 6015(f). See Cheshire v. Commissioner, 115 T.C. 183, 198 (2000), affd. 282 F.3d 326 (5th Cir. 2002); Butler v. Commissioner, 114 T.C. 276, 292 (2000). Since section 6015(f) is similar to section 6015(b)(1)(D) and the equitable factors considered are the same, we hold that respondent did not abuse his discretion by denying petitioner's request for relief under section 6015(f). See Alt v. Commissioner, 119 T.C. at 316; Barranco v. Commissioner, T.C. Memo. 2003-18.

Conclusion

Respondent did not err in denying petitioner relief from joint and several income tax liability under section 6015(b) or (f). We hold that respondent correctly determined that

collection by levy should proceed.  Accordingly, we shall enter a decision upholding respondent's proposed collection action.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.