T.C. Memo. 2003-301

UNITED STATES TAX COURT

RUTHE G. OHRMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5667-02.　　　　　　　Filed October 29, 2003.

<u>Steven B. Hval</u>, for petitioner.

<u>Nhi T. Luu-Sanders</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  This proceeding was commenced under section
6015 for review of respondent's determination that petitioner is
not entitled to relief from joint and several liability for 1999
with respect to a joint return filed with Steven F. Ohrman
(Mr. Ohrman).  The issues for decision are:  (1) Whether
petitioner is eligible for relief from joint and several

liability under section 6015(b); (2) whether petitioner is liable under section 6015(c)(4) to the extent she received disqualified assets notwithstanding a valid election under section 6015(c); and (3) whether respondent abused his discretion in denying petitioner's request for relief from joint and several liability under section 6015(f).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue.  All dollar amounts have been rounded to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  At the time the petition in this case was filed, petitioner resided in Portland, Oregon.

Background

Petitioner and Mr. Ohrman were married in Seattle, Washington, on March 26, 1988.  On September 9, 1994, petitioner and Mr. Ohrman purchased a personal residence on Birdshill Road in Portland, Oregon (Birdshill residence).  At the time of trial in March 2003, petitioner was 53 years old and Mr. Ohrman was 56 years old.

Petitioner attended college for at least 2 years and worked towards a teaching degree, but she did not graduate.  From 1985 to 1995, petitioner worked as a lending officer at two large

banks.  While working as a lending officer, petitioner dealt with real estate agents and reviewed mortgage loan applications. Petitioner became a full-time homemaker when her grandniece Alexa moved into her home in 1995.

Mr. Ohrman has worked for Spicers Paper, Inc. (Spicers Paper), in Gresham, Oregon, as its regional manager for the Portland, Oregon, and Seattle, Washington, divisions for several years including 1999.  As of the time of trial, Mr. Ohrman's salary was $135,000 per year, and his take-home pay was approximately $6,800 per month.

Mr. Ohrman's Gambling Addiction

Mr. Ohrman has an admitted gambling addiction.  Petitioner first became aware of Mr. Ohrman's gambling in 1993.  In 1998, Mr. Ohrman enrolled in Project STOP (the State of Oregon gambling treatment center) to seek treatment for his gambling addiction. Petitioner participated in Project STOP's "significant other" program to support Mr. Ohrman.  While participating in Project STOP, Mr. Ohrman revealed to petitioner that he had accrued approximately $200,000 in outstanding gambling debts on various joint credit cards held in Mr. Ohrman's and petitioner's names. Mr. Ohrman graduated from Project STOP on December 19, 1998, and received a Certificate of Achievement.

During the Project STOP program, petitioner was advised to block Mr. Ohrman's ability to obtain money.  Pursuant to this

advice, petitioner took control of the family finances in 1999. Petitioner wrote checks to pay the bills, reviewed monthly bank statements, and maintained a file drawer in the Birdshill residence where she kept the family's financial records. In addition, petitioner removed Mr. Ohrman's name from their joint checking account at U.S. Bank (U.S. Bank checking account) as well as from their joint money market savings account at U.S. Bank. Petitioner also obtained quarterly credit reports under her name to check for inquiries and new credit during 1999. Petitioner, however, did not remove Mr. Ohrman's name from either the $60,000 home equity line of credit held by petitioner and Mr. Ohrman with Wells Fargo Bank (Wells Fargo home equity line of credit) or the joint checking account petitioner and Mr. Ohrman maintained at Key Bank in Seattle.

After she took control of the family finances, petitioner had Mr. Ohrman's wages from Spicers Paper deposited directly into her U.S. Bank checking account during 1999. Petitioner was the only authorized signer on the U.S. Bank checking account, and Mr. Ohrman had no access to this account. Mr. Ohrman's wages provided the only income source from which petitioner paid her family's ongoing living expenses, including Mr. Ohrman's pre-1998 gambling debts. Despite petitioner's efforts, Mr. Ohrman's gambling addiction persisted through 1999.

Mr. Ohrman's Early Withdrawals From His Retirement Account

During 1999, Mr. Ohrman was the owner of an individual retirement account (IRA) at Dean Witter Reynolds (Dean Witter account). The Dean Witter account was a rollover account set up by petitioner and Mr. Ohrman in 1997. Petitioner was present with Mr. Ohrman when the Dean Witter account was established. Thereafter, petitioner maintained a file for the Dean Witter account and placed the monthly account statements into a notebook. As of February 28, 1999, the Dean Witter account had a total asset value of $454,406.

Petitioner was the designated beneficiary of the Dean Witter account, but her written consent was not required to make an early withdrawal. Petitioner was aware of how much money was in the Dean Witter account in 1998 and 1999, and she believed there was approximately $700,000 in the account at one point in 1998. Because of the size of the Dean Witter account, petitioner solicited promises from Mr. Ohrman before and during 1999 that he would not use any of the funds in the Dean Witter account for gambling.

Despite his promises to petitioner, Mr. Ohrman withdrew $79,000 in early distributions from the Dean Witter account in 11 separate transactions from March 19 to December 21, 1999, to fund his gambling addiction. Petitioner neither knew about nor consented to these early distributions, nor did petitioner sign

any of the IRA distribution request forms.  Mr. Ohrman was the only person who endorsed the distribution checks.

Statements for the months of March, April, May, June, July, and August 1999 for the Dean Witter account were received at the Birdshill residence.  These monthly statements showed that withdrawals totaling $44,000 were taken from the Dean Witter account in the following amounts:  March, $5,000; April, $5,000; May, $8,000; June, $5,000; July, $13,000; and August, $8,000.  In September 1999, Mr. Ohrman changed the address on the Dean Witter account statements from the Birdshill residence to his work address at Spicers Paper.  Consequently, the monthly statements for September, October, November, and December 1999 for the Dean Witter account were sent to Mr. Ohrman's work address.

Mr. Ohrman opened an individual checking account at Wells Fargo Bank (Wells Fargo checking account) prior to December 8, 1998, and he used this checking account throughout 1999 in connection with his gambling.  Mr. Ohrman opened the Wells Fargo checking account without petitioner's knowledge or consent. Mr. Ohrman also obtained credit cards in his name alone after graduating from Project STOP.  These credit cards were used to fund his gambling addiction and were not known to petitioner until June 2001.  The early withdrawals taken by Mr. Ohrman from the Dean Witter account during 1999 were used at least in part to pay down the gambling debt attributable to these credit cards.

On April 15, 2000, petitioner and Mr. Ohrman filed a joint 1999 Federal income tax return (joint 1999 return), Form 1040, U.S. Individual Income Tax Return, and attachments. Petitioner prepared the joint 1999 return on her home computer using Turbo Tax, a tax preparation program. Although two Forms 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., for 1999 were sent to Mr. Ohrman at the Birdshill residence--one indicating a gross distribution and taxable amount of $71,000 from the Dean Witter account and the other indicating a gross distribution and taxable amount of $8,000 from the Dean Witter account--the $79,000 in distributions withdrawn by Mr. Ohrman from his Dean Witter account was not reported on the joint 1999 return filed by petitioner and Mr. Ohrman.

The $79,000 withdrawn by Mr. Ohrman from the Dean Witter account was taxable income, the omission of which from the joint 1999 return resulted in an understatement of tax attributable to an erroneous item of Mr. Ohrman. At the time petitioner signed the joint 1999 return, she did not have actual knowledge of the early distributions from the Dean Witter account.

On May 29, 2001, respondent issued a letter of proposed changes to petitioner's and Mr. Ohrman's reported tax liability for 1999. This letter proposed that petitioner and Mr. Ohrman owed an additional $42,927 (consisting of $32,217 in deficiency,

$6,443 in accuracy-related penalty, and $4,267 in interest) for 1999. The letter of proposed changes was received by petitioner at the Birdshill residence in early June 2001. Within a few days after receiving respondent's letter of proposed changes, petitioner confronted Mr. Ohrman and learned of the early distributions from the Dean Witter account.

Legal Separation Proceedings and Transfer of Assets

Within 1 week after receipt of respondent's letter of proposed changes, petitioner met with Laura Rackner (Rackner), an attorney in Portland who specializes in divorce and family law, for advice. During this meeting, petitioner told Rackner that she received respondent's letter of proposed changes for 1999. In addition, petitioner told Rackner that Mr. Ohrman was a compulsive gambler and that she wanted to be protected from his gambling-related debt.

Rackner informed petitioner that there was a possibility that she could obtain relief from joint and several liability for the 1999 tax deficiency. After hearing Rackner's advice, petitioner told Rackner that she wanted a financial separation from Mr. Ohrman. Accordingly, petitioner provided assets and liabilities information to Rackner, including the value of the Birdshill residence and the value of the funds in Mr. Ohrman's Dean Witter account and in his 401(k) retirement account. On

June 21, 2001, petitioner filed for a legal separation from Mr. Ohrman in Clackamas County (Oregon) Circuit Court.

On June 25, 2001, petitioner and Mr. Ohrman signed a Stipulated Judgment for Unlimited Separation (separation agreement), and Mr. Ohrman conveyed his interest in the Birdshill residence to petitioner.  Rackner drafted the separation agreement for petitioner.

On July 3, 2001, Circuit Court Judge Patrick D. Gilroy signed the separation agreement in the matter of Ohrman v. Ohrman, Case No. DR0106592.  Mr. Ohrman was not represented at any point during the proceedings for legal separation.  Upon execution of the separation agreement, Mr. Ohrman conveyed to petitioner his interest in the Birdshill residence.  Petitioner also received ownership of a 1998 Lexus automobile, the Dean Witter account, and a 401(k) retirement account that had been held in Mr. Ohrman's name.  In addition, Mr. Ohrman was required to pay to petitioner spousal support as follows:  (1) $6,000 per month, commencing on July 1, 2001, until the Birdshill residence was sold and the sales transaction was completed; (2) $5,000 per month for 12 months thereafter; (3) $4,000 per month for 66 months thereafter; and then (4) $1,500 per month indefinitely.

Pursuant to the separation agreement, Mr. Ohrman has been required to maintain medical, dental, and hospital insurance on petitioner.  He has also been required to maintain life insurance

through his employer and through Transamerica with petitioner as beneficiary. Additionally, Mr. Ohrman was required to pay, defend, indemnify, and hold harmless petitioner for 19 specified credit cards held in his name in addition to all other credit cards, loans, debts, notes, encumbrances, credit lines, equity lines, or other financial obligations in his name, with the exception of an Alaska Airlines Visa account.

Finally, Mr. Ohrman agreed to:

pay, defend, indemnify and hold * * * [petitioner] harmless from any claim made by any taxing agency arising out of tax returns previously filed by the parties. * * * [Mr. Ohrman] shall be liable, indemnify and hold * * * [petitioner] harmless from the tax liabilities resulting for 1999, 2000 and 2001. * * * [Mr. Ohrman] shall be responsible for communicating with the taxing agencies and do all that is necessary to protect * * * [petitioner] from the tax obligation.

Excluding the right to spousal support, insurance coverages, and the 1998 Lexus, petitioner received assets with an approximate fair market value of $782,000 under the separation agreement. The fair market value of the Birdshill residence as of June 2001 was approximately $500,000. The true and actual stated consideration in the Bargain and Sale Deed transferring Mr. Ohrman's interest in the Birdshill residence to petitioner was $0. The 401(k) retirement account had a value of $36,581 on March 31, 2001. The Dean Witter account had a value of $246,234 on May 31, 2001. Under the separation agreement, Mr. Ohrman retained only his personal belongings, which consisted of

clothing, items stored in the garage of the Birdshill residence, his tools, and a 1997 Honda automobile.

## Petitioner's and Mr. Ohrman's Relationship After Their "Financial Separation"

Although petitioner and Mr. Ohrman were legally separated as of July 2001, they continued to reside together.  They remained at the Birdshill residence until June 20, 2002.  On June 10, 2002, petitioner sold the Birdshill residence for $520,000.  Petitioner received $63,087 in proceeds from the sale of the Birdshill residence.

After the sale of the Birdshill residence, petitioner and Mr. Ohrman rented a room together at a hotel in Portland from June 21, 2002, through July 15, 2002.  On July 15, 2002, petitioner purchased a new personal residence on Carlton Street in Portland (Carlton residence) for $363,000.  Petitioner made a downpayment of $79,438 to purchase the Carlton residence.  In petitioner's Uniform Residential Loan Application for the purchase of the Carlton residence, dated July 17, 2002, petitioner listed assets with a total value of $940,000 and reported a net worth of $525,373.  Petitioner and Mr. Ohrman have resided together at the Carlton residence from July 20, 2002, to at least March 2003.

In addition to residing together, petitioner and Mr. Ohrman have been raising their grandniece Alexa together as parents.  Petitioner and Mr. Ohrman were awarded full custody of Alexa on

February 24, 2002.  Petitioner and Mr. Ohrman have also continued to socialize together as a couple since their legal separation.

Petitioner has remained in control of the family finances since the legal separation and has used Mr. Ohrman's monthly support payments to pay her family's ongoing living expenses, consisting of the monthly mortgage payment on the Carlton residence, the utilities, the monthly payment due on her Alaska Airlines Visa credit card, the house and car insurance premiums, and groceries for Mr. Ohrman, Alexa, and herself.  In addition to making the monthly support payments to petitioner, Mr. Ohrman pays at least an additional $1,800 per month for Alexa's schooling, his gambling debt, health insurance for petitioner and Alexa, and life insurance.

Revenue Agent McConnell's Examination

On December 10, 2001, respondent sent a statutory notice of deficiency to petitioner and Mr. Ohrman for 1999.  In the notice of deficiency, respondent determined that petitioner and Mr. Ohrman are liable for a deficiency in income tax of $31,515 and a section 6662(a) accuracy-related penalty in the amount of $6,303.  On March 10, 2002, petitioner timely filed her Petition for Determination of Relief from Joint and Several Liability on a Joint Return under section 6015(b), (c), and (f) in response to the statutory notice of deficiency.

In August 2002, Revenue Agent Joan McConnell (McConnell) was assigned to examine petitioner's qualification for relief from joint and several liability under section 6015. McConnell interviewed petitioner on September 11, 2002. During this interview, petitioner told McConnell that monthly statements for the Dean Witter account came to the Birdshill residence during 1999, but she did not open them because they were not addressed to her. Additionally, petitioner explained to McConnell that she obtained the legal separation from Mr. Ohrman in order to protect herself financially. Petitioner also provided to McConnell a written response to respondent's Innocent Spouse Questionnaire at this interview and signed it under penalties of perjury.

McConnell interviewed Mr. Ohrman on October 31, 2002. When questioned during this interview about the transfer of assets to petitioner, Mr. Ohrman told McConnell that the legal separation and transfer of assets were his ideas and that he did not feel that petitioner should have to pay for his mistakes.

McConnell referred to Rev. Proc. 2000-15, 2000-1 C.B. 447, to determine whether petitioner should be granted equitable relief under section 6015(f) for the 1999 tax deficiency. Based upon her analysis of the facts and circumstances of petitioner's case, McConnell determined that petitioner did not qualify for equitable relief under section 6015(f). McConnell concluded that petitioner received a transfer of disqualified assets from

Mr. Ohrman.  In addition, McConnell concluded that petitioner had reason to know of at least some of the distributions from the Dean Witter account.

OPINION

Generally, married taxpayers may elect to file a joint Federal income tax return.  Sec. 6013(a).  After making the election, each spouse is jointly and severally liable for the entire tax due for that taxable year.  Sec. 6013(d)(3).  A spouse (requesting spouse) may, however, seek relief from joint and several liability by following procedures established in section 6015.  Sec. 6015(a).  A requesting spouse may request relief from liability under section 6015(b) or, if eligible, may allocate liability according to provisions under section 6015(c).  Sec. 6015(a).  If relief is not available under section 6015(b) or (c), an individual may seek equitable relief under section 6015(f).

Section 6015(b) Analysis

Section 6015(b) provides, in pertinent part, as follows:

> SEC. 6015(b).  Procedures For Relief From Liability Applicable to All Joint Filers.--
>
> > (1) In general.--Under procedures prescribed by the Secretary, if--
> >
> > > (A) a joint return has been made for a taxable year;
> > >
> > > (B) on such return there is an understatement of tax attributable to

erroneous items of 1 individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

The requirements of section 6015(b)(1) are stated in the conjunctive. Accordingly, a failure to meet any one of them prevents a requesting spouse from qualifying for relief offered therein. Alt v. Commissioner, 119 T.C. 306, 313 (2002).

There is no dispute that petitioner satisfies subparagraphs (A) and (B) of section 6015(b)(1). Moreover, respondent does not argue that petitioner's election was untimely under section 6015(b)(1)(E). Respondent contends, however, that petitioner failed to meet the requirements of subparagraphs (C) and (D) of section 6015(b)(1). Petitioner argues that she has met all of

the requirements for equitable relief set forth in section 6015(b)(1) and is entitled to relief from joint and several liability for the joint 1999 return.

Section 6015(b)(1)(C) requires that the requesting spouse establish that in signing the return she did not know, and had no reason to know, that there was an understatement. The parties have stipulated that petitioner did not have actual knowledge of the understatement at the time she signed the joint 1999 return. In deciding whether petitioner has carried her burden of proof in establishing that she had no reason to know of the understatement in the joint 1999 return, witness credibility is an important consideration. See Penfield v. Commissioner, T.C. Memo. 2002-254; Ishizaki v. Commissioner, T.C. Memo. 2001-318. In this case, as discussed below, various inconsistencies in the assertions of petitioner and Mr. Ohrman undermine the reliability of their generalized assertions that petitioner had no reason to know of the withdrawals from the Dean Witter account. Therefore, we are not required to accept them. See Geiger v. Commissioner, 440 F.2d 688 (9th Cir. 1971), affg. T.C. Memo. 1969-159.

Petitioner believed that there was approximately $700,000 in the Dean Witter account at one point in 1998. In an effort to protect this amount, she solicited promises from Mr. Ohrman before and during 1999 that he would not use any of the funds in the Dean Witter account for gambling. Petitioner was aware of

how much money was in the Dean Witter account in 1998 and 1999 because she was present with Mr. Ohrman when the account was established and had maintained a file for the account's monthly statements.

While Mr. Ohrman may have been deceitful in hiding the actual withdrawals from the Dean Witter account from petitioner, the account statements showing these withdrawals were sent to the Birdshill residence for the months of March, April, May, June, July, and August 1999. These statements show that withdrawals totaling $44,000 were taken from the Dean Witter account during these months. Mr. Ohrman changed the address on the Dean Witter account to his work address in September 1999.

It is not clear from the testimony or the evidence before us what happened to the Dean Witter account statements for the months of March, April, May, June, July, and August 1999. Petitioner does not account for these six monthly account statements in her written response to respondent's Innocent Spouse Questionnaire. Specifically, in petitioner's response to question No. 22 of the Innocent Spouse Questionnaire, she provided information only as to Mr. Ohrman's changing the address on the Dean Witter account statements for the months of September, October, November, and December 1999 and his evasiveness about the account statements for those months.

When McConnell interviewed petitioner on September 11, 2002, she inquired as to the Dean Witter account statements for the 6 months of March through August 1999. Petitioner told McConnell that monthly statements for the Dean Witter account came to the Birdshill residence during 1999, but she did not open them because they were not addressed to her. When questioned at trial, however, petitioner was not so forthcoming with an explanation as to what happened to the Dean Witter account statements for the 6 months of March through August 1999. Petitioner testified that she could not remember getting any statements during 1999 for the Dean Witter account at the Birdshill residence. Therefore, when examined in their totality, petitioner's response on the Innocent Spouse Questionnaire, her response to McConnell during their interview of September 11, 2002, regarding the delivery of the Dean Witter account statements to the Birdshill residence during 1999, and her response at trial about these statements are vague, inconsistent, and evasive.

Mr. Ohrman also provided testimony as to what happened to the Dean Witter account statements for the 6 months of March through August 1999. Mr. Ohrman testified that he would leave work and "chase the mailtruck" in order to prevent the Dean Witter account statements from reaching the Birdshill residence. He also testified that, when petitioner asked about the Dean

Witter account statements, he would show her statements that he had "doctored up" in order to hide his withdrawals from the Dean Witter account. When asked about the whereabouts of these "doctored up" statements on cross-examination, however, Mr. Ohrman acknowledged that neither he nor petitioner had provided them and that "they were thrown away" by him or petitioner.

The Dean Witter account statements were not the only source of information indicating that Mr. Ohrman had taken the early withdrawals during 1999. Two Forms 1099-R for 1999 were also sent to the Birdshill residence--one indicating a gross distribution and taxable amount of $71,000 from the Dean Witter account and the other indicating a gross distribution and taxable amount of $8,000 from the Dean Witter account. On the Innocent Spouse Questionnaire, petitioner stated that the two Forms 1099-R were sent to Mr. Ohrman's work address. This statement is inconsistent with the address clearly shown on both Forms 1099-R.

Petitioner is a fairly well-educated individual who had gained experience with financial matters as a result of her 10 years of employment as a lending officer with two large banks. Petitioner took complete control of her family's finances in 1999 as a result of Mr. Ohrman's gambling addiction, was aware of the existence and magnitude of the Dean Witter account, and prepared the joint 1999 return by herself. A reasonable person in

petitioner's position would have been put on notice by Mr. Ohrman's evasion and deception with respect to the Dean Witter account statements. Petitioner was well aware of the extent of Mr. Ohrman's past gambling and that he needed access to money in order to continue gambling. Even though petitioner had knowledge of these facts, she did not keep close watch over the Dean Witter account. Although petitioner also suffered difficult personal circumstances during 1999, she was able to retain control of other aspects of the family finances. Therefore, when we consider the entire record of this case, we conclude that petitioner has not established that she had no reason to know of the understatement when she signed the joint 1999 return.

We also conclude that petitioner has not satisfied the requirements of subparagraph (D) of section 6015(b)(1). Taking into account all the facts and circumstances of petitioner's case, it is not inequitable to hold her liable for the 1999 tax deficiency because the tax-avoidance purpose of the separation agreement is apparent from the evidence. First, a proposed tax liability of nearly $43,000 prompted petitioner to meet with Rackner for advice in early June 2001. Second, petitioner told Rackner about the proposed tax deficiency during this meeting, and Rackner informed her that relief from joint and several liability might be available. Third, with the knowledge that relief from joint and several liability might be available to

her, petitioner instructed Rackner to draft the separation agreement whereby she would be financially separated from Mr. Ohrman. Fourth, pursuant to this separation agreement, petitioner received approximately $782,000 in assets that had previously been held in Mr. Ohrman's name along with spousal support amounting to at least $4,000 per month for a minimum period of 78 months, leaving Mr. Ohrman stripped of nearly all of his assets and monthly income. Finally, petitioner and Mr. Ohrman have continued their marital relationship since their legal separation was finalized in July 2001 and have continued to use Mr. Ohrman's income to pay the family's ongoing living expenses.

In Doyle v. Commissioner, T.C. Memo. 2003-96, we denied a taxpayer relief from joint and several liability under section 6015(b)(1)(D) because she and her family had engaged in a systematic plan to put their assets beyond the reach of respondent's legitimate collection activities. Similarly, in Pierce v. Commissioner, T.C. Memo. 2003-188, we denied a taxpayer relief under section 6015(b)(1)(D) when the object of a series of transactions entered into by the taxpayer was to shield assets from creditors, which ultimately included respondent. In both cases, we concluded that granting relief to taxpayers in such circumstances would wrongfully permit them to shield themselves from Federal tax liabilities by using section 6015.

In this case, petitioner has presented no credible nontax reason for the transfer of assets pursuant to the separation agreement. Mr. Ohrman's gambling addiction, long known to her, did not cause a legal separation. Petitioner reacted to that situation by taking practical control of the family finances. These circumstances lead us to the ultimate conclusion that petitioner obtained a legal separation in order to shield as many assets and as much of the family's income as possible from the 1999 tax deficiency.

Furthermore, it is not inequitable to hold petitioner liable for the 1999 tax deficiency because she would not suffer a major financial hardship as a result. Petitioner holds assets that she could use to pay the 1999 tax deficiency. In addition, her family's living expenses are all paid from Mr. Ohrman's earnings. Therefore, although her circumstances may be unfortunate, they do not compel relief from joint and several tax liability under section 6015(b).

Section 6015(c) Analysis

Because petitioner cannot avoid liability for the deficiency arising from the joint 1999 return under section 6015(b), we now turn our attention to her claim for relief from joint and several liability under section 6015(c). Section 6015(c) allows a taxpayer, who is eligible and so elects, to limit his or her liability to the portion of a deficiency that is properly

allocable to the taxpayer as provided in section 6015(d). Sec. 6015(c)(1). Under section 6015(d)(3)(A), generally, any items that give rise to a deficiency on a joint return, e.g., the unreported early distributions from the Dean Witter account, shall be allocated to the individual filing the return in the same manner as it would have been allocated if the individual had filed a separate return for the taxable year.

A taxpayer is eligible to elect the application of section 6015(c) if, at the time the election is filed, the taxpayer is legally separated from the individual with whom the taxpayer filed the joint return to which the election relates. Sec. 6015(c)(3)(A)(i)(I). Furthermore, the election under section 6015(c) must not be made later than 2 years after the date on which respondent has begun collection activities with respect to the taxpayer making the election. Sec. 6015(c)(3)(B). Respondent does not contend that petitioner's election under section 6015(c) was untimely. Therefore, petitioner is eligible to elect the application of section 6015(c) to limit her liability for the 1999 tax deficiency.

The issue with which we are faced in this case, however, deals with the application of section 6015(c)(4) to the transfer of assets from Mr. Ohrman to petitioner pursuant to the separation agreement. Specifically, we must decide whether the amount of the 1999 tax deficiency for which petitioner can be

held liable under section 6015(c)(1) may be increased as a result of a transfer of disqualified assets under section 6015(c)(4).

Under section 6015(c)(4)(A), the portion of the deficiency for which the taxpayer electing the application of section 6015(c) is liable (without regard to section 6015(c)(4)(A)) is increased by the value of any disqualified asset transferred to the taxpayer.  The term "disqualified asset" means any property or right to property transferred to the taxpayer making the election under section 6015(c) (i.e., petitioner) by the other individual filing such joint return (i.e., Mr. Ohrman) if the principal purpose of the transfer was the avoidance of tax or payment of tax.  Sec. 6015(c)(4)(B)(i).

Under section 6015(c)(4)(B)(ii), there is a presumption that any asset transfer that occurs after the date that is 1 year before the first letter of proposed deficiency is sent by respondent has as its principal purpose the avoidance of tax or payment of tax.  (The letter of proposed deficiency allows the taxpayer an opportunity for administrative review in the Internal Revenue Service Office of Appeals.  Sec. 6015(c)(4)(B)(ii)(I).) This presumption, however, does not apply to any transfer made pursuant to a decree of divorce or separate maintenance or a written instrument incident to such a decree.  Sec. 6015(c)(4)(B)(ii)(II); see also sec. 71(b)(2)(B) (explaining that the term "divorce or separation instrument" means a written

separation agreement).  Consequently, this presumption is not applicable in this case because the transfer of assets from Mr. Ohrman to petitioner took place pursuant to a written separation agreement.

Respondent argues that the burden of proof under section 6015(c)(4) is on petitioner because of the language of section 6015(c)(2) and caselaw interpreting section 6015(c).  Conversely, petitioner contends that respondent has the burden of proof because of the language of section 1.6015-3(c)(3)(iii), Income Tax Regs., and the legislative history of section 6015(c).  We need not resolve this dispute, however, because the preponderance of the evidence establishes that the principal purpose of the transfer was the avoidance of tax.

Respondent contends that the facts of this case show that petitioner and Mr. Ohrman intentionally and purposely obtained a legal separation and transferred assets in an attempt to shield these assets from respondent's effort to collect the 1999 tax deficiency.  Petitioner primarily argues that, because the transfer of assets from Mr. Ohrman to petitioner took place pursuant to the equitable distribution rules of Oregon family law, the transfer did not have as its principal purpose the avoidance of tax or payment of tax.  For the reasons set forth below, respondent's argument is persuasive on this matter.

Petitioner's use of State family law as a vehicle to lend legitimacy to Mr. Ohrman's transfer of assets and income to her is the type of abuse that Congress expressly intended to stop by adding paragraph (4) to section 6015(c). While the State of Oregon's equitable distribution rules provided the mechanism for the transfer of Mr. Ohrman's assets and income to petitioner, they do not negate the principal purpose for which the transfer occurred, the avoidance of tax. As discussed in detail above, the separation agreement was a way for petitioner to enjoy the benefits of the family assets and income without satisfying the 1999 tax deficiency. Accordingly, we hold that petitioner received a transfer of disqualified assets under section 6015(c)(4).

The next step in the section 6015(c) analysis is to decide the amount by which petitioner's liability for the 1999 tax deficiency should be increased because of the transfer of disqualified assets. Under section 6015(c)(4)(A), the portion of the deficiency for which petitioner is liable is increased by the value of the disqualified assets that were transferred to her. In this case, petitioner's portion of the 1999 tax deficiency would have been zero absent the transfer of disqualified assets because of her eligibility to make an election to limit her liability under section 6015(c)(3). The value of the disqualified assets petitioner received, however, far exceeds

petitioner's liability for the 1999 tax deficiency.
Consequently, her election under section 6015(c) does not allow
her to avoid liability for those taxes.

Section 6015(f) Analysis

Section 6015(f) provides an additional opportunity for
relief to those taxpayers who do not otherwise meet the
requirements of subsection (b) or (c) of section 6015.
Specifically, section 6015(f) gives respondent the discretion to
grant equitable relief from joint and several liability if
"taking into account all the facts and circumstances, it is
inequitable to hold the individual liable for any unpaid tax".

We have jurisdiction to review respondent's denial of
petitioner's request for equitable relief under section 6015(f).
Jonson v. Commissioner, 118 T.C. 106, 125 (2002); Butler v.
Commissioner, 114 T.C. 276, 292 (2000).  We review such denial of
relief to decide whether respondent abused his discretion by
acting arbitrarily, capriciously, or without sound basis in fact.
Jonson v. Commissioner, supra at 125; Butler v. Commissioner,
supra at 292.  The review of respondent's denial of petitioner's
request for relief under section 6015(f) is a question of fact.
Cheshire v. Commissioner, 115 T.C. 183, 198 (2000), affd. 282
F.3d 326 (5th Cir. 2002).  Petitioner bears the burden of proving
that respondent abused his discretion.  Washington v.
Commissioner, 120 T.C. 137, 146 (2003); see also Alt v.

Commissioner, 119 T.C. 306, 311 (2002) ("Except as otherwise provided in section 6015, petitioner bears the burden of proof."); Jonson v. Commissioner, supra at 113 (same).

As directed by section 6015(f), respondent has prescribed procedures to use in determining whether a relief-seeking spouse qualifies for relief under section 6015(f).  At the time that petitioner filed her Petition for Determination of Relief from Joint and Several Liability on a Joint Return, March 10, 2002, those procedures were found in Rev. Proc. 2000-15, 2000-1 C.B. 447.  Section 4.01 of Rev. Proc. 2000-15, 2000-1 C.B. at 448, lists seven threshold conditions that must be satisfied before respondent will consider a request for relief under section 6015(f).  The threshold conditions are as follows:

> (1) The requesting spouse filed a joint return for the taxable year for which relief is sought;
>
> (2) Relief is not available to the requesting spouse under [section] 6015(b) or 6015(c);
>
> (3) The requesting spouse applies for relief no later than two years after the date of the Service's first collection activity after July 22, 1998, with respect to the requesting spouse;
>
> (4) * * * the liability remains unpaid. * * *
>
> (5) No assets were transferred between the spouses filing the joint return as part of a fraudulent scheme by such spouses;
>
> (6) There were no disqualified assets transferred to the requesting spouse by the nonrequesting spouse. If there were disqualified assets transferred to the requesting spouse by the nonrequesting spouse, relief will be available only to the extent that the liability

exceeds the value of such disqualified assets.  For this purpose, the term "disqualified asset" has such meaning given such term by section 6015(c)(4)(B); and

(7) The requesting spouse did not file the return with fraudulent intent.

Id.  A requesting spouse must satisfy all seven threshold conditions before respondent will consider his or her request for equitable relief under section 6015(f).  Id.  We have upheld the use of these procedures in reviewing a negative determination. See Washington v. Commissioner, supra at 147; Jonson v. Commissioner, supra at 125.

Respondent denied petitioner's request for equitable relief under section 6015(f) because she did not meet all seven of the threshold conditions listed above.  Specifically, respondent concluded that petitioner received a transfer of disqualified assets from Mr. Ohrman in violation of the sixth condition of Rev. Proc. 2000-15, sec. 4.01.  Respondent reached this conclusion by considering the time line of events beginning with petitioner's receipt of the May 29, 2001, letter of proposed changes to petitioner's and Mr. Ohrman's reported tax liability for 1999, the transfer of assets from Mr. Ohrman to petitioner pursuant to the separation agreement, and statements made by petitioner and Mr. Ohrman during their separate interviews with respondent.  Petitioner maintains that she did not receive a transfer of disqualified assets; thus, petitioner argues that she

has satisfied the threshold requirements of Rev. Proc. 2000-15, sec. 4.01.

Because we decided that petitioner received a transfer of disqualified assets from Mr. Ohrman, we conclude that petitioner does not meet all seven of the threshold conditions of Rev. Proc. 2000-15, sec. 4.01.  Accordingly, we conclude that respondent did not abuse his discretion by acting arbitrarily, capriciously, or without sound basis in fact in denying petitioner's request for equitable relief under section 6015(f).

Conclusion

We hold that respondent did not err in denying petitioner relief from joint and several liability under section 6015 with respect to the joint return filed with Mr. Ohrman for 1999.  We have considered the arguments of the parties not specifically addressed in this opinion.  Those arguments are either without merit or irrelevant to our decision.

To reflect the foregoing,

Decision will be entered

for respondent.