T.C. Memo. 2004-274


UNITED STATES TAX COURT


SUSAN L. ABELEIN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 19707-02.          Filed December 2, 2004.


<u>Terri A. Merriam</u>, <u>Wendy S. Pearson</u>, and <u>Jennifer A. Gellner</u>,
for petitioner.

<u>Robert V. Boeshaar</u> and <u>Julie L. Payne</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


MARVEL, <u>Judge</u>:  This case arises from a request for relief
under section 6015[1] with respect to petitioner's 1982, 1983,
1984, 1985, and 1986 taxable years.  Respondent determined

_____

[1]All section references are to the Internal Revenue Code in
effect for the years in issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure.

petitioner was not entitled to any relief under section 6015.

Petitioner timely filed a petition seeking review of respondent's

determination. After concessions,[2] the issue for decision is

whether petitioner is entitled to relief under section 6015(b) or

(f) for 1982, 1983, 1984, 1985, and 1986.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

The first, second, and third stipulations of facts are

incorporated herein by this reference. Petitioner resided in

Boring, Oregon, when her petition in this case was filed.

Petitioner's Education

Petitioner attended 1 year of college and then enrolled in a

1-year licensed practical nurse (LPN) program. Petitioner

graduated from the program and worked as an LPN for several

years. Petitioner eventually attended a registered nursing (RN)

program and is currently employed as an RN. Petitioner has

worked as an RN in triage, dermatology, internal medicine,

obstetrics and gynecology, and hospice care. Petitioner has

never taken any courses in finance, bookkeeping, or tax.

---

[2]At trial, the Court reserved ruling on Exhibit 243-P and ordered the parties to brief the issue of its admissibility. In his opening brief, respondent conceded the admissibility of Exhibit 234-P. From the descriptions of the exhibit in the transcript and the brief, and based on our review of Exhibits 234-P and 243-P, however, it is clear respondent intended to concede the admissibility of Exhibit 243-P. Consequently, we shall treat respondent's concession on brief as a concession with respect to Exhibit 243-P.

Petitioner's Relationship With Daniel Abelein

Petitioner and Daniel Abelein (Mr. Abelein) married in 1971. As of the date of trial, they were still married and living together.

Petitioner generally had no desire to understand and no interest in business matters and did not attempt to understand business documents or read fine print. Petitioner was, however, responsible for paying the household bills, and, during the years at issue, she did so from her joint account with Mr. Abelein. According to petitioner, although Mr. Abelein made all of the family's financial decisions,[3] petitioner and Mr. Abelein decided on and saved for large purchases together.

Petitioner sometimes disagreed with Mr. Abelein's decisions but was never threatened by Mr. Abelein into making investments, signing their tax returns, or signing checks. Mr. Abelein never deceived petitioner about their finances or hid mail from her. Mr. Abelein answered petitioner honestly if she asked him about their finances. Mr. Abelein never abused petitioner.

During the years at issue, petitioner and Mr. Abelein lived in the same house that they built in 1978, drove used cars, took

---

[3]Mr. Abelein graduated from high school and completed 2 years of college and an apprenticeship as an electrician. Mr. Abelein worked as an electrician and recently started his own general contracting company. As of 1986, Mr. Abelein had no formal education in finance or tax and no experience in cattle ranching or selling cattle.

inexpensive vacations, and had no investments other than their Hoyt partnership investments and a Hoyt individual retirement account (IRA).

Hoyt Partnerships

Walter J. Hoyt III (Mr. Hoyt) was the son of a prominent Shorthorn cattle breeder who, along with other members of his family, organized, promoted, and operated more than 100 cattle breeding partnerships from 1971 to 1998. Each partnership was organized and marketed in the same manner, and Mr. Hoyt served as the general partner of each partnership. For an overview of the Hoyt organization, see Bales v. Commissioner, T.C. Memo. 1989-568; see also River City Ranches #1, Ltd. v. Commissioner, T.C. Memo. 2003-150; Mekulsia v. Commissioner, T.C. Memo. 2003-138; Durham Farms #1 v. Commissioner, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003); River City Ranches #4 v. Commissioner, T.C. Memo. 1999-209, affd. 23 Fed. Appx. 744 (9th Cir. 2001).

Investment in Durham Genetics Engineering 1985-1 Ltd.

In 1985 Mr. Abelein learned of the Hoyt organization from his brother. After speaking with another friend who had invested in the Hoyt partnerships, Mr. Abelein contacted an accountant to inquire whether the investment was legal. Although Mr. Abelein did not pay the accountant or provide the accountant with any of the Hoyt promotional materials, the accountant advised him the

Hoyt partnership was legal. Mr. Abelein also contacted a local Internal Revenue Service (IRS) agent to determine whether the investment was legal. The agent would not discuss the Hoyt investment with Mr. Abelein and only answered Mr. Abelein's general questions regarding the relationship of the Federal Government and the cattle industry.

Before investing, petitioner reviewed a Hoyt brochure and had access to other Hoyt materials. Petitioner and Mr. Abelein also attended a Hoyt partnership meeting where two Hoyt representatives were present. Mr. Abelein asked petitioner to go to the meeting because he wanted petitioner to hear about the Hoyt organization directly from those involved in the company rather than from him.

Mr. Abelein was very forthcoming towards petitioner with respect to what he knew about the Hoyt partnerships. He explained to petitioner that they would claim losses from the partnership on their joint tax returns and should not expect to earn a profit until the 8th to 10th year of the partnership. Petitioner knew that she and Mr. Abelein could get refunds from previous years' tax returns and invest them in the Hoyt cattle business. Petitioner and Mr. Abelein agreed that they should invest in the Hoyt organization to help pay for their children's college tuition.

In 1985 both petitioner and Mr. Abelein signed three separate subscription agreements for series A, B, and C units in the Timeshare Breeding Service 1985-1 Ltd., also known as Durham Genetics Engineering 1985-1 Ltd. (hereinafter DGE), partnership. Mr. Abelein asked petitioner to sign the necessary subscription agreements to invest and become partners in the Hoyt partnership. Mr. Abelein did not threaten petitioner to induce her to sign the Hoyt agreements. Each subscription agreement stated that the parties' signatures evidenced their intent to subscribe to the units and to enter into a partnership agreement, and the subscription agreement for series A units also granted Mr. Hoyt a power of attorney over partnership matters. Mr. Hoyt signed the partnership agreement as attorney in fact for petitioner and Mr. Abelein.

On all three subscription agreements for DGE, Mr. Abelein signed on the line for "subscriber" to the investment. On the DGE subscription agreements for series B and C units, petitioner signed on the line for "Signature of Spouse Subscriber if purchase is made jointly". On the series A agreement, a checkmark was placed on the line next to "community property", an ownership option which only required one signature. Petitioner nevertheless signed on the line indicated for "Signature of Spouse" on the series "A" agreement. This agreement also contained the following language: "The UNDERSIGNED: * * *

Recognize the Partnership has no history of operations or earnings and this investment therein is a speculative venture, and if they elect to participate, they may lose the total amount of their investment * * *".

DGE issued a Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., for 1986 and an amended Schedule K-1 for 1985 to petitioner and Mr. Abelein that listed them both as partners. Petitioner and Mr. Abelein also received Schedules K-1 from their other Hoyt investments each year from 1987 to 1995 that always listed both petitioner and Mr. Abelein as partners.[4] Petitioner never questioned why she was listed as a partner or made any effort to remove her name from partnership-related documents.

After investing in DGE, Mr. Abelein attended partnership meetings at least once a month and asked petitioner to attend with him. Petitioner attended approximately half of the meetings. Petitioner did not ask any questions at the meetings. In 1992 or 1993, petitioner and Mr. Abelein also visited the Hoyt ranches.

---

[4]From 1985 through 1996, petitioner and Mr. Abelein invested in several other Hoyt partnerships: Durham Genetic Engineering 1986-A, Florin Farms #4, and Shorthorn Genetic Engineering 1985-1. The record does not disclose whether the Abeleins invested in these partnerships jointly or separately.

The Abeleins' Treatment of Hoyt Documents

The Abeleins received correspondence from the Hoyt organization, including monthly newsletters, advertisements, and newspaper articles which informed them of recent developments in the cattle breeding industry and events taking place within the Hoyt organization. Mr. Abelein would typically read the correspondence and then leave it for petitioner to read or file with their other Hoyt-related materials. Petitioner looked at the pictures and read the social news in the correspondence but chose not to read the materials that were business-related or contained a lot of words. Petitioner had access to the correspondence at all times.

In addition, the Abeleins received a brochure entitled "The 1,000 lb. Tax Shelter, A ROUND-UP OF DATA AND A QUICK COURSE IN CATTLE BREEDING TAX SHELTERS" from the Hoyt organization. The "Specific Risks Involved" section of the brochure stated: "A change in the tax law or an audit and disallowance by the IRS could take away all or part of the tax benefits, plus the possibility of having to pay back the tax savings, with penalties and interest."[5] The brochure highlighted that the partnerships

_____

[5]This same language was used in the "Registered Livestock Purchase Guide", another Hoyt brochure petitioner received. This brochure also compared investing in a Hoyt partnership to a roller coaster ride and cautioned: "The cattle business today cannot be separated from tax law any more than cattle can be separated from grass and water. Don't have anything to do with

(continued...)

would be "subject to constant audits by the IRS".  The brochure even warned "If you don't have a tax man who knows you well enough to give you specific personal advice as to whether or not you belong in the cattle business, stay out", and "Don't have anything to do with any aspect of the cattle business without thorough tax advice".  The brochure also echoed the language of the subscription agreements, noting:  "If you invest in a cattle partnership, you may lose every last dime you put into it."

Mr. Abelein occasionally asked petitioner to follow up on the Hoyt information they received.  Mr. Abelein asked petitioner to call the Hoyt organization and to ask questions for him about the materials.  Mr. Abelein also reviewed bills from the Hoyt organization and made payment decisions when necessary, including decisions about additional participation in Hoyt opportunities. Mr. Abelein explained to petitioner what the bills were for and told or asked her to pay them.

Petitioner wrote numerous checks to the Hoyt organization from her joint account with Mr. Abelein, including a check for $9,770 in 1986.  When the Hoyt bills differed from petitioner's expectations, she questioned the discrepancies and asked Mr. Abelein to discuss them with the Hoyt organization.  According to

---

[5](...continued)
any aspect of the cattle business without having a good tax pro working with you all the time as a continuing part of the deal."

petitioner, she relied on Mr. Abelein because she felt he had more business sense than she did.

Tax Returns

Petitioner and Mr. Abelein filed joint Federal income tax returns for 1982, 1983, 1984, 1985, and 1986.  On or about May, 28, 1986, petitioner and Mr. Abelein filed Form 1045, Application for Tentative Refund, on which they carried back an investment credit from DGE and applied it to their 1982, 1983, and 1984 taxable years.  Petitioner and Mr. Abelein received refunds of $4,871, $4,573, and $3,229 for 1982, 1983, and 1984, respectively.  As a result, petitioner and Mr. Abelein paid no income taxes for those years.

On their Federal income tax returns for 1982-86, petitioner and Mr. Abelein reported the following:

| Year | Total income before Sch. E loss | Sch. E loss | IRA contribution | Investment credit |
|------|-------------------|---------|--------------|------------|
| 1982 | $42,903 | -- | -- | -- |
| 1983 | 45,416 | -- | -- | -- |
| 1984 | 38,725 | -- | -- | -- |
| 1985 | 41,146 | $24,216 | -- | $9 |
| 1986 | 44,013 | 20,180 | $2,000 | 62 |

The Schedule E, Supplemental Income Schedule, losses were the losses attributable to DGE that were allocated to petitioner and Mr. Abelein on the Schedules K-1 they received from the Hoyt organization.  The IRA contribution represented an amount allegedly contributed to an IRA established for petitioner and Mr. Abelein.

Before petitioner and Mr. Abelein invested in the Hoyt partnerships, Mr. Abelein prepared the returns himself or had a tax return preparer or accountant prepare the returns. After petitioner and Mr. Abelein invested in the Hoyt partnerships, the Tax Office of W.J. Hoyt Sons Management Company prepared their returns. When Mr. Abelein received the completed returns from the Hoyt organization, he looked over the returns and signed them. Petitioner also signed the returns. Petitioner knew she was not allowed to deduct expenses on the returns that she did not incur and that it was important to review the returns before she signed them. Mr. Abelein did not threaten petitioner to obtain her signature on the returns.

Petitioner could identify the Hoyt-related items on their 1985 and 1986 returns. Petitioner even asked Mr. Abelein about the numbers on their 1985 Form 3468, Computation of Investment Credit, which accompanied their 1985 tax return, because she did not understand where they came from. In later years, petitioner asked Mr. Abelein other questions about the effect of the investment on their tax returns, including "How can you legally go back on your taxes?" and "How can you have so many deductions when you really don't have that many kids?"

The Hoyt Partnership Litigation and Settlement

The Commissioner initiated audits of the Hoyt partnerships, including but not limited to DGE, and sent appropriate notices to

the partners, including petitioner and Mr. Abelein.[6]  Mr. Hoyt, the tax matters partner for the partnerships, represented the Hoyt partnerships during the audits.

As a result of the audits, the Commissioner proposed adjustments to the Hoyt partnership tax returns.  The Hoyt partnerships filed petitions in this Court to contest the partnership adjustments.  The partnership-level proceedings were resolved as a result of our opinions in Shorthorn Genetic Engg. 1982-2, Ltd. v. Commissioner, T.C. Memo. 1996-515, and Bales v. Commissioner, T.C. Memo. 1989-568 (involving 26 dockets filed by partners in similar Hoyt partnerships that were tried as test cases and covered taxable years before 1982), and a memorandum of understanding between the IRS and Mr. Hoyt dated May 20, 1993 (the settlement agreement), that set forth the basis for settling all Hoyt cattle partnership cases for 1980 through 1986.

In Bales v. Commissioner, supra, we held, inter alia, that although the Hoyt partnerships at issue were not lacking in economic substance and would be respected for tax purposes,

---

[6]For example, on Sept. 26, 1988, respondent sent petitioner and Mr. Abelein a notice of beginning of an administrative proceeding at the partnership level concerning the audit of DGE for the taxable year 1986.  On Nov. 21, 1988, respondent sent petitioner and Mr. Abelein a notice of beginning of an administrative proceeding at the partnership level concerning the audit of DGE for the taxable year 1985.  On Oct. 1, 1990, respondent sent petitioner and Mr. Abelein a notice of final partnership administrative adjustment concerning the audit of DGE for the taxable year 1986.

adjustments to the Hoyt partnerships' proportionate shares of losses generated from the acquisition, management, and sale of Hoyt cattle were required, and the recalculated losses were deductible by the limited partners to the extent of the partners' adjusted bases.

The settlement agreement, which was executed after we issued Bales in 1989, provided, in pertinent part, as follows:

- deductions for contributions to an Individual Retirement Arrangement -- also called an Investment Retirement Account -- are limited to cash actually paid to custodial banks on or before the due date of the return for which the deduction is to be claimed.

    *    *    *    *    *    *    *

- The total number of cattle in service and subject to depreciation by the investor partnerships in each of the following respective years is

    1980 -- 1,736
    1981 -- 2,463
    1982 -- 2,388
    1983 -- 2,932
    1984 -- 3,476
    1985 -- 4,024
    1986 -- 6,409

- For Federal income tax purposes, all the cattle are adult breeding cattle, each having an original depreciable basis of $4,000.

- The number of cattle to be depreciated during any year will be determined by the following method:

    " The depreciable cattle in the herd of each investor partnership will be adjusted by multiplying the number listed in the partnership's books and records by the ratio of the aggregate number of cattle in service in all the partnerships (as indicated

immediately above) over the aggregate number of cattle listed in the partnerships' books and records and subject to depreciation.

For example, in the year 1980, the books and records of Florin Farms # 1 indicate that the partnership claimed 149 head of cattle subject to depreciation. The aggregate number of cattle listed in the depreciation schedules of all the investor partnerships was 4,659. For purposes of this case, then, Florin Farms # 1 would be considered to have 56 head of cattle subject to depreciation, computed as follows:

$$149 \times \frac{1,736}{4,659} = 56$$

- Depreciation for all cattle placed in service in 1980 will be computed using the straight line method and a 5 year useful life -- without regard to the ADR system, or any other methods previously used.

- All cattle which were already in partnerships on January 1, 1980, will be considered placed in service in 1977. Such cattle would, therefore, be eligible for depreciation for only 2 years -- 1980 and 1981. They would then be considered fully depreciated.

- Depreciation for all cattle placed in service after 1980 will be computed using the Accelerated Cost Recovery System, considering the cattle 5-year property.

- All purchases of cattle after 1981 are in the year the partnership is formed.

- Investment tax credit will be allowed on the number of cattle in service during the first year of the partnership's existence (as revised by the formula discussed above), times $4,000 per head. Cattle will be considered placed in service in the year the partnership is formed.

- All cattle purchased are new section 38 property.

\*      \*      \*      \*      \*      \*      \*

- Satisfaction of obligations for interest, principal payments and management fees by transferring calves and culled cows will constitute ordinary income to the investor partnerships.  This convention is consistent with the Tax Court's decision in <u>Bales v. Commissioner</u>, which provides that

  "    calves are not section 1231(a) property; and

  "    although culled cattle are section 1231(a) property, the gain on which may be long term capital gain (depending on the holding period), depreciation allowed must be recaptured as ordinary income under the provisions of section 1245.

  \*      \*      \*      \*      \*      \*      \*

- For all years after 1980, Management Company is comprised of Mr. Hoyt, who is entitled to 15% of the profits; and the 24 investor partnerships in existence at December 31, 1981.

  "    The investor partnerships are each entitled to 1/24 of the remaining 85% of the profits.

  "    The investor partnerships are each entitled to 1/24 of 100% of any net losses.

- Each partner's profit and loss sharing percentage is determined annually by comparing the partner's capital account to the aggregate of the capital accounts of all partners in the partnership.  This determination is made based on the total capital owned, not the total capital originally subscribed.

- Partners in the investor partnerships are divided into two categories:

  "    Partners who continue to honor their note obligations to Ranches, and who continue to participate in the Hoyt Cattle partnership. For purposes of this memorandum, will be referred to as the "active partners."

" Partners who have walked away from their note obligations and/or who no longer participate in the partnership. For purposes of this memorandum, will be referred to as the "inactive partners."

- The determination of when and whether a partner is active or inactive and the status of the partner's ownership interest will be made using all appropriate records of Ranches, the investor partnerships and the individual partners including, but not limited to, Ranches' note records; whether or not Schedules K-1 were issued to partners; whether the partners continued to claim items from the partnership on Federal income tax returns; correspondence; and Forms 1099.

- The amount of liabilities assumed personally by the partners during the first year of the partnership will be based on original subscription agreements, and will be provided by Walter J. Hoyt III within one week after the partnership spreadsheet is submitted to him for review and/or correction.

- For Federal income tax purposes, the maximum amount of partnership debt which can be assumed by all partners in an investor partnership is determined by multiplying the number of cattle in service during the first year of the partnership's existence -- as indicated above -- by the fair market value of the cattle for Federal income tax purposes, $4,000.

> For example, Poison Creek Ranches # 2 is considered to have put in service 118 head of cattle in 1981. The cost basis of the cattle for purposes of depreciation is $4,000 per head. Therefore, the maximum amount of the note due to Ranches incident to depreciation, and which is includible in the partner's basis is $472,000, calculated as follows:

| Cattle In Service | 118 |
|---|---|
| Cost Basis (per head) | $ 4,000 |
| Total Partnership Note Includible in Basis | $472,000 |

- All partners who originally assumed personal
  liability for a portion of the partnership debt
  during the first year of the partnership --
  whether they are now determined to be active or
  inactive partners -- will be assigned a share of
  the lower amount of recognized partnership debt
  described above.  Each partner's share will be the
  exact same percentage as his/her share of the
  partnership debt originally assumed.

  *     *     *     *     *     *     *

- Inactive partners are deemed to have liquidated
  their respective partnership interest when they
  abandon it, according to the following guidelines:

  "     The amount realized by partners on the
        liquidation of their partnership interest
        will be the amount of the assumed liability
        for which they remained liable when they
        abandoned their interest in the partnership.
        This amount is the partner's share of the
        lower recognized partnership debt described
        above.

  "     The deemed liquidation of partnership
        interest by inactive partners will occur on
        December 31 of the year they become inactive,
        as described above.

- In computing "At Risk," active partners are
  entitled to include their prorated share of
  partnership debt which was previously attributable
  to inactive partners for purposes of "At Risk" and
  basis.  Active partners assume this additional
  debt on the date an inactive partner is deemed to
  have liquidated his/her partnership interest, as
  described in the immediately preceding paragraph.

- Profits, losses and credits -- after considering
  Mr. Hoyt's share -- are allocated strictly on the
  basis of capital account.  This means that each
  partner's interest in the credits, profits and/or
  loss is calculated annually by comparing the
  partner's capital account to the aggregate of the
  capital accounts of all partners in the
  partnership.

> For purposes of computing a partner's capital account, all partners are entitled to include their share of partnership debt for which they assumed personal liability, until they liquidate their interest in the partnership.

- Any partner having a capital account below zero has a basis in the partnership below zero.

Pursuant to, and in accordance with, the settlement agreement and our opinion in Shorthorn Genetic Engg. 1982-2, Ltd. v. Commissioner, T.C. Memo. 1996-515, the capital account of petitioner and Mr. Abelein was recomputed, and computational adjustments were made to the distributive shares of Hoyt partnership losses claimed by petitioner and Mr. Abelein, resulting in deficiencies for each of the years at issue.  The adjustments were primarily attributable to the fact that the Hoyt organization had sold more cattle to the various Hoyt limited partnerships than it actually owned, see id., and had failed to properly account for income generated by the sales of calves in calculating partnership losses, see Bales v. Commissioner, T.C. Memo. 1989-568.  On March 6, 1998, respondent mailed petitioner and Mr. Abelein a letter that explained how respondent's examination of DGE's partnership returns affected the Abeleins' income tax liability for taxable years 1982 through 1986.[7]

_____

[7]Respondent's adjustments resulted in reductions of the Schedule E losses and investment credits the Abeleins claimed and a disallowance of their IRA contribution deduction so that the Abeleins' tax liability was increased for the taxable years in issue as follows:  $4,871 for 1982; $4,573 for 1983; $3,229

(continued...)

Petitioner and Mr. Abelein handled IRS correspondence in the same way as the Hoyt materials so that it was available to petitioner at all times.

Over the years, petitioner told Mr. Abelein she did not want to be a part of the partnership anymore. Despite her concerns and notice of the partnership audits, petitioner made no efforts to extricate herself from the Hoyt partnership and continued to invest in the organization with Mr. Abelein.

Petitioner's Innocent Spouse Claim

On or around July 7, 2000, petitioner submitted a Form 8857, Request for Innocent Spouse Relief (And Separation of Liability and Equitable Relief), on which she requested relief pursuant to section 6015(b) for the taxable years 1982 through 1996.[8]

On August 23, 2001, respondent sent petitioner a preliminary determination letter denying petitioner's request for relief under section 6015(b), (c), and (f) for taxable years 1982 through 1986. Respondent denied relief on the basis that (1) Petitioner had actual knowledge or reason to know of the item giving rise to the understatement; (2) petitioner did not show

---

[7](...continued)
for 1984; $3,141 for 1985; and $2,992 for 1986.

[8]On Nov. 14, 2000, respondent sent petitioner a letter indicating her request for relief for 1987 through 1997 was premature. On Aug. 9, 2001, respondent sent petitioner a letter indicating her request for relief for tax years 1993 and 1995 was premature.

the erroneous items were attributable to her spouse; (3) petitioner did not demonstrate that it would be inequitable to hold her liable for the deficiency attributable to the understatement; and (4) petitioner did not meet the marital status requirements of section 6015(c).  On September 17, 2001, petitioner timely submitted a written appeal of respondent's determination.

On September 26, 2002, respondent issued a notice of determination in which he concluded that petitioner did not qualify for relief from joint and several liability under section 6015(b), (c), or (f).  With respect to his determination under section 6015(b), respondent stated that "You failed to meet all the requirements of IRC section 6015(b); therefore, you do not qualify for relief under the law."  With respect to his determination under section 6015(f), respondent stated that "You are not eligible for relief under the law since the majority of the factors weighs against relief."

On December 23, 2002, petitioner timely filed a petition with this Court pursuant to section 6015(e) seeking review of respondent's determination with respect to section 6015(b) and (f) for petitioner's 1982-86 taxable years.[9]

---

[9]We consider petitioner's request for relief under sec. 6015(f) even though she originally requested relief on Form 8857, Request for Innocent Spouse Relief (And Separation of Liability and Equitable Relief), under sec. 6015(b) only.  Respondent
(continued...)

OPINION

In general, taxpayers filing joint Federal income tax returns are each responsible for the accuracy of the return and are jointly and severally liable for the full tax liability. Sec. 6013(d)(3); <u>Butler v. Commissioner</u>, 114 T.C. 276, 282 (2000). In certain circumstances, however, a taxpayer may obtain relief from joint and several liability by satisfying the requirements of section 6015.[10]

Section 6015(a)(1) provides that a spouse who has made a joint return may elect to seek relief from joint and several liability under section 6015(b) (dealing with relief from liability for an understatement of tax on a joint return). Section 6015(a)(2) provides that a spouse who is eligible to do so may elect to limit that spouse's liability for any deficiency with respect to a joint return under section 6015(c). Relief from joint and several liability under section 6015(b) or (c) is available only with respect to a deficiency for the year for

_____

[9](...continued)
treated the application as a request for relief under sec. 6015(b), (c), and (f) and denied relief under each subsection in his preliminary and final determination letters. Petitioner does not dispute respondent's determination with respect to his denial of sec. 6015(c) relief.

[10]Sec. 6015 applies to tax liabilities arising after July 22, 1998, and to tax liabilities arising on or before July 22, 1998, that remain unpaid as of such date. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201(g), 112 Stat. 740.

which relief is sought.  Sec. 6015(b)(1)(D) and (c)(1); see H. Conf. Rept. 105-599, at 252-254 (1998), 1998-3 C.B. 747, 1006-1008.  If relief is not available under either section 6015(b) or (c), an individual may seek equitable relief under section 6015(f), which may be granted by the Commissioner in his discretion.

In this case petitioner contends that she is entitled to full relief from liability under section 6015(b) or (f).

Our jurisdiction to review petitioner's request for relief is conferred by section 6015(e), which allows a spouse who has requested relief from joint and several liability to contest the Commissioner's denial of relief by filing a timely petition in this Court.  We address petitioner's request under subsections (b) and (f) of section 6015 in turn.

A.   Section 6015(b)

Section 6015(b)(1) authorizes respondent to grant relief from joint and several liability if the taxpayer satisfies each requirement of subparagraphs (A) through (E).  Section 6015(b)(1) provides:

> SEC. 6015(b).  Procedures For Relief From Liability Applicable to All Joint Filers.--
>
> (1) In general.--Under procedures prescribed by the Secretary, if--
>
> (A) a joint return has been made for a taxable year;

(B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

The requirements of section 6015(b)(1) are stated in the conjunctive. Therefore, if the requesting spouse fails to meet any one of them, she does not qualify for relief. Alt v. Commissioner, 119 T.C. 306, 313 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004). Except as provided by section 6015, the requesting spouse bears the burden of proving that she satisfies each requirement of section 6015(b)(1).[11] See Rule 142(a).

---

[11]Petitioner does not contend that sec. 7491 applies to this case and has not produced evidence to show she satisfied the requirements of sec. 7491(a).

Respondent does not dispute that petitioner meets the requirements of subparagraphs (A) and (E) of section 6015(b)(1) but contends that petitioner has not satisfied the requirements of subparagraphs (B), (C), and (D) of section 6015(b)(1). Petitioner disagrees.

With respect to subparagraph (B) of section 6015(b)(1), petitioner argues that the understatement of tax is attributable entirely to the erroneous items of Mr. Abelein because the investment in DGE was not a joint investment, and Mr. Abelein was solely responsible for the partnership investment. Respondent argues that the understatement of tax is not solely attributable to the erroneous items of Mr. Abelein because both petitioner and Mr. Abelein owned the partnership interest in DGE, and petitioner participated in the investment. Respondent relies on Ellison v. Commissioner, T.C. Memo. 2004-57, to support his position.

In Ellison v. Commissioner, supra, we held that the taxpayer failed to prove that the understatement of tax was solely attributable to the erroneous items of the nonrequesting spouse under section 6015(b)(1)(B) because the requesting spouse was a partner in the Hoyt partnerships, agreed to invest in the Hoyt partnerships, and did so jointly with her spouse. The taxpayer in Ellison also signed partnership documents and checks payable to the Hoyt organization and used funds from a joint account she held with her spouse to invest in the partnership. The Hoyt

organization also treated the taxpayer as a partner, issuing Schedules K-1 that listed both the taxpayer and her spouse as partners.  Id.

The facts of Ellison are indistinguishable from those in the present case and support the conclusion that the erroneous items are not solely Mr. Abelein's.  Petitioner signed the partnership documents required for her to become a partner and begin the investment, and she indicated she was making the investment jointly with Mr. Abelein.  Petitioner and Mr. Abelein invested in the Hoyt partnerships using funds from their joint bank account. Petitioner wrote and signed personal checks that were payable to the various Hoyt entities for their partnership interests.  The Hoyt organization viewed petitioner and Mr. Abelein as joint investors.

Petitioner contends, however, that joint ownership of the investment is not determinative of whether the erroneous item giving rise to the understatement is attributable to one or both spouses.  Petitioner argues that the erroneous items should be attributed to the individual who made the decisions relating to the investment that produced those items and cites Rowe v. Commissioner, T.C. Memo. 2001-325, to support her contention.

We reject petitioner's argument because Rowe is distinguishable from the present case.  In deciding whether the taxpayer in Rowe was entitled to section 6015(c) relief, we did

not allocate the erroneous losses of the taxpayer's spouse's farming activities to her, even though she was listed as a proprietor on their joint returns, because she made no decisions related to the farm, her spouse withheld relevant financial documents from her, and other than attending occasional horse shows to support her children, the taxpayer was not involved in the farming activity.

In Capehart v. Commissioner, T.C. Memo. 2004-268, we also rejected petitioner's argument for reasons that are equally applicable to the present case. In Capehart, the taxpayer was involved in the Hoyt partnership that generated the erroneous losses at issue, even though her spouse initiated the investment. The taxpayer jointly invested in the partnership with her spouse, met with Mr. Hoyt, toured the Hoyt ranches, received promotional and informational materials from the Hoyt partnerships, became a partner with her spouse by signing a subscription agreement, made calls to the Hoyt organization to obtain answers to questions about the investment, and signed the income tax returns prepared by the Hoyt organization. Consequently, we held in Capehart that the erroneous items giving rise to the understatements of tax were attributable to the taxpayer and her spouse.

As in Capehart, the record demonstrates that petitioner was actively involved, along with Mr. Abelein, in matters relating to their investment in DGE so that Rowe is distinguishable.

Petitioner and Mr. Abelein met Hoyt representatives, toured the Hoyt ranches, received and read various promotional and informational materials from the Hoyt partnerships, became partners by signing the subscription agreements, attended Hoyt partnership meetings, paid Hoyt bills, made phone calls to the Hoyt organization, and reviewed and signed income tax returns prepared by the Hoyt organization.  Additionally, petitioner admitted that she and Mr. Abelein agreed they should invest in the Hoyt partnership.  Regardless of whether Mr. Abelein proposed the DGE investment to petitioner and at times petitioner simply complied with Mr. Abelein's requests out of lack of interest in business matters, petitioner ultimately agreed to invest in the partnership, invested jointly with Mr. Abelein, and actively participated in the investment.  This is sufficient for us to find that the erroneous items giving rise to the understatement of tax are attributable to both petitioner and Mr. Abelein. Capehart v. Commissioner, supra; Bartak v. Commissioner, T.C. Memo. 2004-83; Ellison v. Commissioner, T.C. Memo. 2004-57; see also Mora v. Commissioner, 117 T.C. 279, 290 (2001); Doyel v. Commissioner, T.C. Memo. 2004-35.

We conclude that petitioner has failed to prove that the erroneous items giving rise to the understatement of tax are Mr. Abelein's alone.  Because petitioner's failure to satisfy the requirement of subparagraph (B) of section 6015(b)(1) is

sufficient for us to deny relief pursuant to that section, we need not decide or address whether petitioner satisfied the requirements of section 6015(b)(1)(C) and (D).  However, for the sake of completeness, we conclude that petitioner did not meet the requirements of section 6015(b)(1)(C) and (D) for the reasons set forth in our analysis of section 6015(f), infra. Accordingly, we sustain respondent's determination to deny petitioner relief from joint and several liability under section 6015(b)(1).

B.   Section 6015(f)

Section 6015(f) provides an alternative means of relief for a requesting spouse who does not otherwise qualify for relief under subsection (b) or (c) of section 6015.  Sec. 6015(f)(2). We review the Commissioner's determination to deny equitable relief under section 6015(f) using an abuse of discretion standard.  Butler v. Commissioner, 114 T.C. at 287-292.  Under this standard of review, we defer to the Commissioner's determination unless it is arbitrary, capricious, or without sound basis in fact.  Jonson v. Commissioner, 118 T.C. 106, 125 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).  The question of whether the Commissioner's determination was an abuse of his discretion is a question of fact.  Cheshire v. Commissioner, 115 T.C. 183, 198 (2000), affd. 282 F.3d 326 (5th Cir. 2002).  A requesting spouse bears the burden of proving that the

Commissioner abused his discretion in denying relief under section 6015(f).

Because we have determined petitioner does not qualify for section 6015(b) relief, and petitioner does not seek review of respondent's denial of relief under section 6015(c), we must decide whether respondent abused his discretion in denying petitioner relief from joint and several liability under section 6015(f).  Cheshire v. Commissioner, supra at 198; Butler v. Commissioner, supra at 292.

Pursuant to section 6015(f), the Commissioner has prescribed procedures in Rev. Proc. 2000-15, 2000-1 C.B. 447, for determining whether the requesting spouse qualifies for relief under that section.[12]  In this case, although the notice of determination does not state that respondent utilized the procedures specified in Rev. Proc. 2000-15, supra, to make his determination that petitioner is not entitled to relief under section 6015(f), the notice of determination refers to respondent's analysis of factors, and we assume that respondent's reference to factors in the notice of determination is to the factors enumerated in Rev. Proc. 2000-15, supra.  This Court has upheld the use of the guidelines specified in Rev. Proc. 2000-15,

[12]On August 11, 2003, the Commissioner issued Rev. Proc. 2003-61, 2003-32 I.R.B. 296, which supersedes Rev. Proc. 2000-15, 2000-1 C.B. 447.  The new revenue procedure is effective for requests for relief filed on or after Nov. 1, 2003, and therefore, is inapplicable here.

supra, and has analyzed the factors listed in Rev. Proc. 2000-15, supra, in reviewing the Commissioner's negative determination under section 6015(f). See, e.g., Washington v. Commissioner, 120 T.C. 137, 147-152 (2003); Jonson v. Commissioner, supra at 125-126. Moreover, petitioner has not objected to the use of these guidelines, and she has addressed the factors in her posttrial briefs.

Rev. Proc. 2000-15, sec. 4.01, 2000-1 C.B. at 448, lists seven threshold conditions that must be satisfied before the Commissioner will consider a request for relief under section 6015(f). Respondent concedes that petitioner satisfies the seven threshold conditions.

Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448, provides that, in cases where the threshold conditions set forth in Rev. Proc. 2000-15, sec. 4.01 have been satisfied but the requesting spouse does not qualify for relief under Rev. Proc. 2000-15, sec. 4.02,[13] 2000-1 C.B. at 448, equitable relief may be granted under section 6015(f) if, taking into account all facts and circumstances, it is inequitable to hold the requesting spouse liable. Rev. Proc. 2000-15, sec. 4.03(1) and (2), 2000-1 C.B. at

---

[13]Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. 447, 448, lists the circumstances under which equitable relief under sec. 6015(f) will ordinarily be granted in cases where a liability reported on a joint return is unpaid. Because this case involves deficiencies, not unpaid liabilities reported on joint returns, Rev. Proc. 2000-15, sec. 4.02 does not apply. See Mellen v. Commissioner, T.C. Memo. 2002-280.

448-449, contains a list of positive and negative factors that the Commissioner must take into account in determining, on the facts and circumstances, whether to grant full or partial equitable relief under section 6015(f).  As Rev. Proc. 2000-15, sec. 4.03 makes clear, no single factor is determinative in any particular case, all factors are to be considered and weighed appropriately, and the listing of factors is not intended to be exhaustive.  See also <u>Washington v. Commissioner</u>, <u>supra</u> at 148; <u>Jonson v. Commissioner</u>, <u>supra</u> at 125.

Rev. Proc. 2000-15, sec. 4.03(1) lists the following six positive factors that the Commissioner will weigh in favor of granting equitable relief:

(a) <u>Marital status</u>.  The requesting spouse is separated * * * or divorced from the nonrequesting spouse.

(b) <u>Economic hardship</u>.  The requesting spouse would suffer economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.

(c) <u>Abuse</u>.  The requesting spouse was abused by the nonrequesting spouse, but such abuse did not amount to duress.

(d) <u>No knowledge or reason to know</u>.  In the case of a liability that was properly reported but not paid, the requesting spouse did not know and had no reason to know that the liability would not be paid.  In the case of a liability that arose from a deficiency, the requesting spouse did not know and had no reason to know of the items giving rise to the deficiency.

(e) <u>Nonrequesting spouse's legal obligation</u>.  The nonrequesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the outstanding

liability.  This will not be a factor weighing in favor of relief if the requesting spouse knew or had reason to know, at the time the divorce decree or agreement was entered into, that the nonrequesting spouse would not pay the liability.

> (f) <u>Attributable to nonrequesting spouse</u>.  The liability for which relief is sought is solely attributable to the nonrequesting spouse.

Rev. Proc. 2000-15, sec. 4.03(2) lists the following six negative factors that the Commissioner weighs against granting equitable relief:

> (a) <u>Attributable to the requesting spouse</u>.  The unpaid liability or item giving rise to the deficiency is attributable to the requesting spouse.

> (b) <u>Knowledge, or reason to know</u>.  A requesting spouse knew or had reason to know of the item giving rise to a deficiency or that the reported liability would be unpaid at the time the return was signed. This is an extremely strong factor weighing against relief.  Nonetheless, when the factors in favor of equitable relief are unusually strong, it may be appropriate to grant relief under §6015(f) in limited situations where a requesting spouse knew or had reason to know that the liability would not be paid, and in very limited situations where the requesting spouse knew or had reason to know of an item giving rise to a deficiency.

> (c) <u>Significant benefit</u>.  The requesting spouse has significantly benefitted (beyond normal support) from the unpaid liability or items giving rise to the deficiency.  See §1.6013-5(b).

> (d) <u>Lack of economic hardship</u>.  The requesting spouse will not experience economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.

> (e) <u>Noncompliance with federal income tax laws</u>. The requesting spouse has not made a good faith effort to comply with federal income tax laws in the tax years

following the tax year or years to which the request for relief relates.

(f) Requesting spouse's legal obligation. The requesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the liability.

The knowledge or reason to know factor, the economic hardship factor, and the legal obligation factor in Rev. Proc. 2000-15, sec. 4.03(2)(b), (d), and (f), respectively, are the opposites of the knowledge or reason to know factor, the economic hardship factor, and the legal obligation factor in Rev. Proc. 2000-15, sec. 4.03(1)(d), (b), and (e), respectively. The attribution factor in Rev. Proc. 2000-15, sec. 4.03(2)(a) is substantially the opposite of the attribution factor in Rev. Proc. 2000-15, sec. 4.03(1)(f). Consequently, in our review of the Commissioner's determination denying relief under section 6015(f), we have held that a finding with respect to the reason to know, economic hardship, legal obligation, and attribution factors ordinarily will weigh either in favor of or against granting equitable relief under section 6015(f). Ewing v. Commissioner, 122 T.C. 32, 45 (2004). We have also held that a finding that a requesting spouse did not receive a significant benefit from the item giving rise to the deficiency weighs in favor of granting relief under section 6015(f). Id. Finally, we treat evidence that the remaining positive and negative factors are not applicable as evidence weighing neither in favor of nor against granting equitable relief (i.e., as neutral). Id.

In accordance with the above, we shall consider each of the positive and negative factors enumerated in Rev. Proc. 2000-15, sec. 4.03. We shall also consider whether any additional facts alleged by the parties affect the analysis of whether respondent abused his discretion in denying petitioner equitable relief under section 6015(f).

1. Positive Factors

   a. Marital Status

Petitioner is still married and living with Mr. Abelein. Consequently, this positive factor does not apply. Ewing v. Commissioner, supra at 46.

   b. Economic Hardship

An analysis of economic hardship under Rev. Proc. 2000-15, supra, is conducted using rules similar to those under section 301.6343-1(b)(4), Proced. & Admin. Regs., and focuses on the requesting spouse's inability to pay reasonable basic living expenses. Rev. Proc. 2000-15, sec. 4.02(1)(c). Section 301.6343-1(b)(4)(ii), Proced. & Admin. Regs., provides that the Commissioner will evaluate a requesting spouse's claim of economic hardship by considering any information offered by the requesting spouse that is relevant to the determination, including, but not limited to, the requesting spouse's income, assets and liabilities, age, ability to earn, responsibility for

dependents, and the amount reasonably necessary for basic living expenses.

Petitioner offered no evidence of her income, expenses, assets, or liabilities other than her own testimony and that of her spouse that they continued to live in the same house they built in 1978, drove used cars, and took inexpensive vacations. In the absence of corroborating evidence, we are not required to accept petitioner's self-serving testimony.  Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  Consequently, we conclude that petitioner has failed to carry her burden of proving that requiring her to pay the liabilities from which she seeks relief would result in economic hardship within the meaning of section 301.6343-1(b)(4), Proced. & Admin. Regs.  Because petitioner has failed to establish that she will suffer an economic hardship, we conclude that this positive factor does not apply.

### c.  Abuse by Nonrequesting Spouse

Mr. Abelein never abused petitioner, and he did not persuade petitioner to invest in the Hoyt partnerships by threatening to abuse her.  This positive factor does not apply.  Ewing v. Commissioner, supra at 46; Washington v. Commissioner, 120 T.C. at 149.

### d.  No Knowledge or Reason To Know

The tax liabilities at issue in this case arose from deficiencies.  Petitioner argues that she did not know or have

any reason to know of the items giving rise to those deficiencies.  In order to ascertain the level of the requesting spouse's knowledge of the items giving rise to the deficiency for purposes of section 6015(f), we must examine whether the requesting spouse knew or had reason to know of the factual basis for the denial of the deductions.  Capehart v. Commissioner, T.C. Memo. 2004-268; see also Mora v. Commissioner, 117 T.C. at 291-292; King v. Commissioner, 116 T.C. 198, 204 (2001).

With respect to section 6015(f), our review of the record convinces us that petitioner did not have actual knowledge of the items giving rise to the deficiency.  However, we still must decide whether petitioner had reason to know of the items giving rise to the deficiency.  In order to resolve the issue, we must examine whether and to what extent petitioner had reason to know of the factual basis for respondent's adjustment to the Hoyt partnership loss deductions and the IRA deduction claimed by petitioner and her husband during the years at issue.

At the time she filed her petition, petitioner resided in Oregon.  In the absence of a stipulation to the contrary, the U.S. Court of Appeals for the Ninth Circuit is presumably the proper venue for an appeal in this case.  See sec. 7482(b)(2). We believe that the Court of Appeals would require an analysis of the "reason to know" requirement like the one it articulated in

Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989).[14] Consequently, we first examine whether petitioner had reason to know of the items giving rise to the deficiency, applying the same factors used in Price:  (1) The spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couples' finances.  Id. at 965.  If we conclude that petitioner did not have reason to know, we next examine whether petitioner had knowledge of sufficient facts to impose upon her a duty to inquire.  Id.  Finally, we examine whether petitioner satisfied her duty to inquire.  Id.

In this case, petitioner, who graduated from both an LPN course and an RN course, was actively involved in the family's financial affairs.  She was responsible for paying the family's household bills, wrote and signed checks drawn on the joint checking account, and, together with Mr. Abelein, decided on and saved for large purchases.

---

[14]We believe this to be so even though Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989), involves a different statute.  For a discussion of the "reason to know" analysis used in Price and its applicability, see Capehart v. Commissioner, T.C. Memo. 2004-268.

Mr. Abelein never deceived petitioner about their finances or partnership investments or concealed financial or partnership information from her. With respect to the Hoyt partnership investments, Mr. Abelein encouraged petitioner to attend partnership meetings, to call the Hoyt organization, and to pay the Hoyt partnership bills.

Petitioner also had the opportunity to review the promotional materials they received, but she chose not to do so. See Morello v. Commissioner, T.C. Memo. 2004-181 ("We have consistently applied the principle that the provisions providing relief from joint and several liability are 'designed to protect the innocent, not the intentionally ignorant.'") (quoting Dickey v. Commissioner, T.C. Memo. 1985-478). Those promotional materials warned potential investors that the promised tax savings may be disallowed by the IRS and that potential investors should consult independent tax advisers before making an investment in the partnership. Neither petitioner nor Mr. Abelein hired a competent professional to verify critical factual representations made by the Hoyt organization. Moreover, petitioner was aware of the large partnership deductions being claimed on the tax returns, for not only was she able to identify the Hoyt-related items on their returns, but, in later years, she even questioned Mr. Abelein about the legitimacy of their deductions and their ability to "go back on" their taxes. We

conclude, therefore, that petitioner has not shown that she had no reason to know of the items giving rise to the deficiency.

Even assuming we were to conclude that a reasonably prudent person in petitioner's position at the time she signed the returns for the years at issue could not be expected to know the facts leading to the disallowance of the Hoyt partnership deductions and the IRA contribution deduction, we would still conclude that petitioner failed to satisfy her duty of inquiry. Petitioner and Mr. Abelein did not make any effort to verify the most important and most basic facts essential for the viability of the Hoyt partnership investments and their tax consequences. For example, they conducted no investigation of whether the Hoyt partnerships in which they were investing actually owned cattle in sufficient numbers and with sufficient value to support the projected loss deductions. They did not ask a knowledgeable tax professional to investigate or verify that they would have sufficient basis in their Hoyt partnership investments to claim their distributive shares of partnership tax deductions.[15] They allowed the promoter of the Hoyt partnerships to prepare their personal income tax returns, and they apparently never requested or obtained verification that the IRA contribution claimed on

---

[15]While Mr. Abelein testified he contacted an accountant and an IRS agent about the legality of the Hoyt partnerships, he admitted that he only discussed the partnerships in general terms and that the IRS agent would not discuss the actual Hoyt organization with him at all.

their 1986 joint returns had actually been made by the contribution deadline.  We conclude, therefore, that this factor weighs against granting equitable relief.

### e.  Nonrequesting Spouse's Legal Obligation

Because petitioner is not separated or divorced from her husband, this positive factor does not apply.

### f.  Liabilities Solely Attributable to Nonrequesting Spouse

We concluded earlier in this opinion that, because petitioner and Mr. Abelein were joint investors and petitioner participated in the investment, the erroneous items giving rise to the deficiency are items of both petitioner and Mr. Abelein. Because petitioner has failed to establish that any of the items giving rise to the deficiency are solely attributable to Mr. Abelein, we conclude that this positive factor does not apply.

### 2.  Negative Factors

### a.  Attributable to the Requesting Spouse

Respondent argues that the erroneous items giving rise to the deficiencies are attributable to both petitioner and Mr. Abelein.  We agree with respondent's argument for reasons stated earlier in this opinion.  The record adequately establishes that the Hoyt partnership investments made by petitioner and Mr. Abelein were joint investments and that petitioner actively

participated in making those investments.  This factor weighs against granting petitioner equitable relief under section 6015(f).

### b.  Knowledge or Reason to Know

For the reasons stated in our analysis of the corresponding positive factor, we conclude that petitioner had reason to know of the items giving rise to the deficiencies in this case and/or failed to satisfy her duty of inquiry regarding the items.  This factor weighs heavily against granting petitioner equitable relief under section 6015(f).  Rev. Proc. 2000-15, sec. 4.03(2)(b).

### c.  Significant Benefit

Petitioner argues she did not significantly benefit beyond normal support from the Hoyt partnership losses and investment tax credits giving rise to the deficiencies.  Yet, because of the investment, petitioner and Mr. Abelein received tax savings of $18,806 they otherwise would not have received.  In Doyle v. Commissioner, T.C. Memo. 2003-96, affd. 94 Fed. Appx. 949 (3d Cir. 2004), we held that a requesting spouse significantly benefited from the items giving rise to the deficiency, which were tax shelter deductions, because she received significant tax refunds as a result of the items.  Likewise, in this case, petitioner and Mr. Abelein received substantial income tax refunds as a result of the items giving rise to the deficiencies.

That petitioner and Mr. Abelein decided to reinvest all or a portion of their tax savings in DGE, rather than in a new home or new cars, does not protect petitioner from a conclusion that she and Mr. Abelein received a significant benefit in the form of increased disposable cashflow.  This negative factor applies and weighs against granting petitioner's claim for equitable relief under section 6015(f).  Ewing v. Commissioner, 122 T.C. at 44-45; Capehart v. Commissioner, T.C. Memo. 2004-268.

> d.  Lack of Economic Hardship

As we noted in our discussion of the positive counterpart of this factor, petitioner did not introduce credible evidence to enable us to ascertain her current salary and other income, assets, debts, and reasonable living expenses, although she was in a position to do so.  A taxpayer's failure to call witnesses and produce relevant documentary evidence within her control supports an inference that such testimony and documentation would not support the taxpayer's position.  Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).  Because of the negative inference that we draw from petitioner's failure to produce evidence of her current financial condition, we conclude that requiring petitioner to pay the liabilities from which she seeks relief would not result in economic hardship as that term is defined under Rev. Proc. 2000-

15, 2000-1 C.B. 447.  Consequently, this negative factor applies and weighs against granting petitioner equitable relief in our analysis.

e.  Noncompliance With Federal Income Tax Laws in Subsequent Years

Respondent did not determine that this factor applies and weighs against granting petitioner equitable relief.  Moreover, respondent did not argue in his posttrial briefs that petitioner did not make a good faith effort to comply with her Federal income tax obligations in the years subsequent to the ones at issue here.  Consequently, we conclude that this negative factor does not apply.  See Ewing v. Commissioner, supra at 46-47.

f.  Requesting Spouse's Legal Obligation

With respect to the positive counterpart to this factor, we concluded that petitioner and Mr. Abelein were married during the relevant times and remain so and that neither petitioner nor Mr. Abelein had assumed sole responsibility to pay the liabilities at issue in this case.  These conclusions also dictate our treatment of this factor.  Because petitioner was not solely responsible for paying the liabilities at issue in this case, this negative factor does not apply.

3.  Other Relevant Factors

Petitioner argues that in determining whether it is inequitable to hold petitioner liable for the deficiency, we must consider the complexity of the transactions and Mr. Hoyt's

intentional deception of petitioner about the underlying circumstances that gave rise to the understatement.  Although we may consider other factors in addition to those set forth in Rev. Proc. 2000-15, supra, we have previously rejected petitioner's argument and denied innocent spouse relief in cases where neither spouse knew of the facts that provided the basis for the disallowance of partnership losses on their joint returns. Capehart v. Commissioner, supra; Bartak v. Commissioner, T.C. Memo. 2004-83; Ellison v. Commissioner, T.C. Memo. 2004-57; Doyel v. Commissioner, T.C. Memo. 2004-35.  The purpose of section 6015 is to protect one spouse from the overreaching or dishonesty of the other spouse.  Bartak v. Commissioner, supra (citing Purcell v. Commissioner, 826 F.2d 470, 475 (6th Cir. 1987), affg. 86 T.C. 228 (1986)).  Where the understatement is attributable to the mistaken belief of both the requesting spouse and the other spouse as to the legitimacy of the tax shelter deductions, we have held that it is not inequitable to hold both spouses jointly and severally liable.  Bokum v. Commissioner, 94 T.C. 126, 146 (1990), affd. 992 F.2d 1132 (11th Cir. 1993); McCoy v. Commissioner, 57 T.C. 732, 735 (1972); Bartak v. Commissioner, supra; Ellison v. Commissioner, supra; Doyel v. Commissioner, supra.

After considering all of the facts and circumstances, we find that respondent did not abuse his discretion in denying petitioner equitable relief from joint and several liability under section 6015(f).

C.   Conclusion

We have carefully considered all remaining arguments made by the parties for results contrary to those expressed herein and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered for respondent.